NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
RUTH C. PINKEL (Cal. Bar No. 164770)
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6077/4443
    Facsimile: (213) 894-7631
    E-mail:    ruth.pinkel@usdoj.gov
            lindsey.dotson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>          v.<br><br>ARMAN GABAEE,<br>  aka "Arman Gabay,"<br><br>        Defendant. | No. CR 18-331-GW<br><br>OPPOSITION TO DEFENDANT'S MOTION<br>TO COMPEL PRODUCTION OF DOCUMENTS<br><br>Hearing Date: July 8, 2019<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of the<br>           Hon. George H. Wu |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ruth C. Pinkel and Lindsey Greer Dotson, hereby files its Opposition to Defendant's Motion to Compel Production of Documents.

///

///

///

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 17, 2019                    Respectfully submitted,

                                        NICOLA T. HANNA
                                        United States Attorney

                                        BRANDON D. FOX
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        _____/s/_____
                                        RUTH C. PINKEL
                                        LINDSEY GREER DOTSON
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.    INTRODUCTION.............................................................1

II.   STATEMENT OF FACTS.......................................................2

      A.    Background.........................................................2

      B.    Defendant's Monthly Cash Bribes to CW1.....................3

      C.    Defendant's Offer to Purchase a Million Dollar Home
            for CW1, in Exchange for a $45 Million Lease with the
            County.............................................................4

      D.    Complaint and Indictment Against Defendant................9

      E.    Information and Guilty Plea for CW1........................10

      F.    Discovery.........................................................10

III.  LEGAL STANDARD..........................................................12

IV.   ARGUMENT................................................................14

      A.    The Government Has Already Produced All Material
            Information From the FBI's Confidential Source File;
            Any Remaining Administrative Documents Are Not
            Discoverable......................................................14

      B.    Congress and the Rules of Discovery Prohibit
            Disclosure of CW1's Tax Returns, Particularly Because
            Defendant Again Has Failed to Make a Concrete Showing
            of Materiality....................................................19

V.    CONCLUSION..............................................................21

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**CASES**

Brady v. Maryland,
    373 U.S. 83 (1963).....................................................passim

Giglio v. United States,
    405 U.S. 150 (1972)...................................................passim

Moore v. Illinois,
    408 U.S. 786 (1972)........................................................14

United States v. Ail,
    No. CR 05-325-RE, 2007 WL 1229415 (D. Or. Apr. 24, 2007)......16

United States v. Armstrong,
    517 U.S. 456 (1996)...................................................passim

United States v. Bagley,
    473 U.S. 667 (1985)........................................................12

United States v. Baxter,
    492 F.2d 150 (9th Cir. 1973)........................................14, 15, 17

United States v. Cadet,
    727 F.2d 1453 (9th Cir. 1984)..............................................12

United States v. Conder,
    423 F.2d 904 (6th Cir. 1970)...............................................12

United States v. Fort,
    472 F.3d 1106 (9th Cir. 2007)..............................................16

United States v. Little,
    753 F.2d 1420 (9th Cir. 1984)..............................................12

United States v. Mandel,
    914 F.2d 1215 (9th Cir. 1990)..............................................12

United States v. Marshall,
    532 F.2d 1279 (9th Cir. 1976).........................................passim

United States v. Muniz-Jaquez,
    718 F.3d 1180 (9th Cir. 2013)..............................................13

United States v. Ross,
    511 F.2d 757 (5th Cir. 1975)...............................................13

United States v. Rowland,
    464 F.3d 899 (9th Cir. 2006)...........................................14, 17

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

United States v. Walk,
    533 F.2d 417 (9th Cir. 1975)................................16

United States v. Williams,
    580 F.2d 578 (D.C. Cir. 1978).............................passim

United States v. Wong,
    886 F.2d 252 (9th Cir. 1989)................................12

Weatherford v. Bursey,
    429 U.S. 545 (1977)........................................12

Wood v. Bartholomew,
    516 U.S. 1 (1995)..........................................13

**STATUTES**

18 U.S.C. § 666...............................................1, 9

18 U.S.C. § 1001...............................................10

18 U.S.C. § 1343..............................................1, 9

18 U.S.C. § 1346..............................................1, 9

18 U.S.C. § 3500............................................12, 19

26 U.S.C. § 6103...............................................19

26 U.S.C. § 7206...............................................10

**RULES**

Federal Rule of Criminal Procedure 16......................12, 16

Federal Rule of Criminal Procedure 26.2....................12, 19

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3       Defendant ARMAN GABAEE is a prominent real estate developer who,

4  for years, secured lucrative business deals with the County of Los

5  Angeles (the "County") by paying bribes and kickbacks to a County

6  official.  After that County official became a cooperating government

7  witness ("Cooperating Witness 1" or "CW1"), CW1 consensually recorded

8  six bribe payments and kickbacks, totaling $6,000, from defendant.

9  And when defendant needed help securing a colossal $45 million dollar

10  lease from the County, he again turned to CW1.

11       During consensually recorded meetings and phone calls with CW1,

12  defendant offered to bribe CW1 with the purchase of a million dollar

13  home in Northern California, in exchange for CW1 helping defendant

14  secure that $45 million County lease.  Recorded phone calls

15  intercepted pursuant to two federal wiretap orders further captured

16  defendant's efforts to buy a home as a bribe for CW1.  Ultimately,

17  defendant placed not one, but two, offers on a home for CW1, only to

18  withdraw those offers within hours of federal agents confronting

19  defendant about his bribery scheme.

20       Trial is currently set for September 10, 2019, at which time

21  defendant will face five federal charges -- three counts of Honest

22  Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346, and two

23  counts of Federal Program Bribery, in violation of 18 U.S.C.

24  § 666(a)(2).  In advance of trial, defendant seeks to compel the

25  production of non-material, administrative information from CW1's

26  confidential source file and CW1's tax returns.  Defendant is

27  entitled to neither.

28

With the burden squarely on his shoulders, defendant must offer something, more than mere speculation, to show how and why the documents sought are both necessary and material to preparing his defense.  He has failed.  To make a concrete showing of materiality, a defendant must demonstrate that the evidence would "alter the quantum of proof" in the defense's favor.  <u>United States v. Marshall</u>, 532 F.2d 1279, 1285 (9th Cir. 1976).  Defendant's only basis for his discovery demand is that there could be -- maybe, hopefully -- some nugget of further impeachment information buried in the source file or tax returns.  First, there is none.  Second, defendant's argument is exactly the type of speculative claim the Ninth Circuit and other courts have rejected.  In the end, absolutely nothing defendant requests would present any new impeachment information different or distinct from that which is already in defendant's possession.  He has failed to meet his burden, and as such, his motion should be denied.

## II.  STATEMENT OF FACTS[1]

### A.  Background

At all times relevant to the charges in this case, defendant was the co-managing partner and co-founder of the Charles Company, a real estate development firm that developed and maintained commercial and residential real estate projects.  Defendant was also a partner of the California limited partnership M&A Gabaee, among other entities. Defendant's business activities included obtaining contracts with the

---

[1] The Statement of Facts with respect to defendant's conduct is based primarily on the allegations in the indictment (dkt. 14) and complaint (dkt. 1).

2

County, whereby the County would lease property owned by defendant or one of his companies.

CW1 was a public official employed by the County in its Real Estate Division.  As an agent of the County, CW1 negotiated leases between private property owners, like defendant, and County departments or agencies.  While employed by the County, CW1 requested and received proposals from private property owners who wanted to lease space to the County.  Once a property was identified for a County department or agency in need of space, CW1 negotiated lease terms and drafted lease agreements, or directed others to do so.  As a public official, CW1 owed a fiduciary duty to both the County and its citizens to perform the duties and responsibilities of CW1's office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.

**B.   Defendant's Monthly Cash Bribes to CW1**

For over six years, defendant kept CW1 on his "payroll" in exchange for CW1 helping advance defendant's business interests. Beginning in or about 2010 or 2011, and continuing until April 11, 2017, defendant paid CW1 bribes and kickbacks of approximately $1,000 about every month, in exchange for the following, among other things: (a) CW1 providing non-public County information to defendant; (b) CW1 resolving issues between defendant and County departments or agencies on terms favorable to defendant; and (c) CW1 helping to secure County leases for defendant and negotiating terms in those leases that were beneficial to defendant.

After CW1 became a cooperating government witness, CW1 consensually recorded six bribe and kickback payments, totaling $6,000, from defendant.  These bribe payments captured by the

3

government on audio and video recordings were a literal snapshot of the ongoing improper relationship of breakfast, lunch, and coffee dates where defendant regularly paid cash to CW1 in exchange for CW1's help.  Defendant gave CW1 the following cash payments during recorded meetings on the following dates: $1,500 on December 20, 2016; $1,500 on December 30, 2016; $1,000 on January 27, 2017; $1,000 on March 1, 2017; $900 on March 31, 2017; and $100 on April 11, 2017.

### C.  Defendant's Offer to Purchase a Million Dollar Home for CW1, in Exchange for a $45 Million Lease with the County

In 2016 and 2017, one of the County leases defendant sought was for the Hawthorne Mall in Hawthorne, California.  Through one of his companies, defendant owned and was redeveloping the mall.  Defendant was seeking a contract with the County, whereby the County would lease space in the mall for the Department of Public Social Services ("DPSS") and other County departments or agencies (the "DPSS Lease").  As drafted, the DPSS Lease anticipated a term of 10 years and payments to defendant, in the form of rent and tenant improvements reimbursable by the County, in excess of $45 million.  The DPSS Lease was an integral part of defendant's plan to redevelop the Hawthorne Mall, the development of which defendant himself stated would cause the mall's assessed value to increase from $17 million to $500 million.

In hopes of securing the lucrative lease, defendant attempted to bribe -- and did bribe -- CW1 with continued monthly cash payments in exchange for CW1 performing multiple official acts related to the Hawthorne Mall and DPPS Lease.  For a County contract of this magnitude, however, defendant decided to sweeten the pot.

4

During consensually recorded phone calls and meetings with CW1 prior to the wiretap, defendant offered to purchase a million dollar home in Northern California as a bribe for CW1.  Later phone calls intercepted pursuant to two federal wiretap orders captured defendant's efforts to make good on his offer.  Intercepted calls showed defendant attempting to locate a property for CW1, place an offer on it, and conceal his involvement in the transaction.

Defendant's offer to purchase the home for CW1 came directly from defendant's own lips.  During a recorded meeting on January 27, 2017, prior to the wiretap, defendant paid CW1 a $1,000 cash bribe and offered to purchase a property in Northern California for CW1 if CW1 helped secure the DPSS Lease in the Hawthorne Mall for defendant.[2]  In fact, to entice CW1 to go along with the bribery scheme, defendant dangled the carrot of an even "better" bribe in the future if CW1 could help secure yet another lease for defendant, this time for defendant's Pomona property:

> DEF: If you want to do Hawthorne, we can do this.  Remember you wanted to buy that ranch [a reference to the property in Northern California]?
>
> CW1: [Laughs.]
>
> DEF: I'm serious.  I'm not joking with you.  You do Pomona, it only gets better.

To emphasize his point, defendant proceeded to tell CW1 three times in a row that he had "already told" his brother/business partner about his "promise" to CW1 with regard to the Northern California property.

---

[2] In the December 30, 2016 in-person meeting, defendant offered to "fix whatever problems you got" and asked CW1 what happened to "the North" in an apparent reference to the ranch property.

Three days later, during a recorded phone call on January 30, 2017, defendant and CW1 briefly discussed "the Hawthorne deal" and defendant's offer to "do something up North." But defendant became skittish about discussing the scheme over the phone. He said, "I don't want to talk on the phone," and suggested that the two meet in person.

Defendant and CW1 then met on February 2, 2017. During the recorded meeting, they discussed defendant's offer to purchase the Northern California property. CW1 asked, "how are we going to make it work for Northern California?" Defendant responded that he was "ready" and would "make it work." Defendant said, "let me go ask my help and see what I can find." He told CW1 to give him an "idea, like on a map" of a specific location in Northern California to look for potential properties. CW1 suggested "the Santa Rosa area."

On March 1, 2017, during an in-person meeting, defendant paid CW1 a $1,000 cash bribe in exchange for, among other things, CW1 helping to secure the DPSS Lease. During the recorded meeting, CW1 offered to "push" DPSS and County Employee 1 to get the DPSS Lease and deal for the Hawthorne Mall "going." CW1 promised a "whole new lease [the DPSS Lease]... before August [2017]" and would make sure the deal "look[ed] good on paper," so as to avoid raising any concerns or suspicion. In exchange, defendant reassured CW1 that he was looking "hot and heavy" for a property to purchase in Northern California for CW1. He said, "I'm going to start getting really aggressive with the North."

Intercepted phone calls and emails thereafter showed defendant making good on his word -- he was, indeed, getting "really aggressive" with trying to locate a property for CW1. (The

government's wiretap of defendant's phone began on March 1, 2017.)
On March 2, 2017, Business Associate 1, an individual who worked with
defendant and helped defendant locate properties for sale in Northern
California, emailed defendant approximately 25 real estate listings
for properties in and around the Santa Rosa area in Northern
California.  Defendant then offered CW1 his choice from among some of
those properties.  During a recorded in-person meeting on March 8,
2017, defendant handed CW1 approximately 12 real estate listings
ranging in price from $899,000 to $1,288,000.  One of the listings
was for a home on Barnes Road in Santa Rosa (the "Barnes Road
Property"), which was listed for $1,199,000.

　　　　After discussing the real estate listings, defendant offered to
purchase the Barnes Road Property for CW1 during a recorded in-person
meeting on March 15, 2017.  In an effort to conceal the transaction,
however, defendant said that the purchase "ha[d] to be in some kind
of an LLC" so that defendant and CW1 could appear to "have nothing to
do with it."  Defendant thereafter tried to move forward with
purchasing the Barnes Road Property, but it was already in escrow.
During a recorded phone call on March 24, 2017, defendant told CW1
that the Barnes Road Property was already in escrow but that he was
"trying to put a back-up [offer] on it."  CW1 offered to "look at
something else," and defendant told him to "take a look at that
list," referring to the real estate listings defendant had given CW1
on March 8, 2017.

　　　　On April 6, 2017, during a recorded phone call, CW1 told
defendant that CW1 had "good news."  "I stuck my neck out, pushed
hard, had a meeting yesterday," CW1 said.  "Hawthorne can move
forward."  CW1 continued, "I'm gonna move forward with the 10-year

7

[DPSS Lease]."  Having just received CW1's "good news" about the DPSS Lease for the Hawthorne Mall and CW1's efforts to make that "good news" possible, defendant said that he was "fully engaged" on locating a property in Northern California.

Shortly after telling CW1 that he was "fully engaged" on locating a property for CW1, defendant spoke with Business Associate 1.  During the recorded phone call, defendant asked Business Associate 1 to see if "there's a way we can get that house [the Barnes Road Property]."  Business Associate 1 told defendant that the Barnes Road Property already had a back-up offer and had sold. Business Associate 1 promised to keep defendant informed about any other properties that might become available.  Defendant again urged Business Associate 1 to be discrete, telling Business Associate 1 that he wanted "this to be confidential."

The very next day, defendant spoke with Business Associate 1 during another recorded phone call, again about purchasing a property in Northern California.  Business Associate 1 told defendant, "I have some other good news for you."  Business Associate 1 said, "I think I found another property in Santa Rosa."  Without asking to see the property in person or discussing the list price, defendant told Business Associate 1 to "make the offer."  Defendant told Business Associate 1 that the offer could not be under defendant's name, however, and asked whether Business Associate 1 had "any entity" that could "sign for" the offer.  Defendant said that if Business Associate 1 used an entity to make the offer, defendant would later take ownership of the property via "assignment."

During a recorded phone call on April 10, 2017, defendant told CW1 that he had "made an offer on something," referring to the

Northern California property.  CW1 asked, "you saw something that looked good?"  Defendant responded, "Yeah, I told them today to go ahead and make the offer; I don't want to lose it the second time."

On April 11, 2017, during a recorded meeting, CW1 handed defendant a copy of the DPSS Lease.  The parties to the lease were the County and M&A Gabaee.  The DPSS Lease was for a period of 10 years and worth at least $45,464,400 for defendant and his company based on the terms of the agreement.  After CW1 had given defendant the DPSS Lease, defendant handed CW1 a real estate listing for a property on Annadel Heights Drive in Santa Rosa (the "Annadel Heights Property").  Defendant said, "this is the one [on which] I'm trying to make an offer."  The list price for the Annadel Heights Property was originally $1,199,000 but later reduced to $1,095,000.

Defendant thereafter placed not one, but two, offers on the Annadel Heights Property.  Defendant's first offer, placed on or about April 24, 2017, was for $1,035,000.  To improve his chances of getting the property though, he upped his own offer just a day later, placing a second offer on or about April 25, 2017 for $1,065,000.  When federal agents, however, arrived at defendant's doorstep and revealed to him that they were aware of his efforts to bribe CW1, the offer was promptly withdrawn within hours.

D.   **Complaint and Indictment Against Defendant**

On May 10, 2018, a criminal complaint was filed against defendant for one count of Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(2).  (Dkt. 1.)  On May 30, 2018, a federal grand jury returned a five-count indictment against defendant for Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346, and

Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(2).
(Dkt. 14.)  Trial is currently scheduled for September 10, 2019.

### E.   Information and Guilty Plea for CW1

Following defendant's indictment, CW1 pleaded guilty to a two-count information charging him with Making False Statements, in violation of 18 U.S.C. § 1001(a)(2), and Subscribing to a False Tax Return, in violation of 26 U.S.C. § 7206(1).  CW1's publicly-filed plea agreement contains a robust eight-page factual basis detailing CW1's receipt of bribes from defendant and an electrical contractor, a kickback scheme in which defendant arranged to receive improper kickbacks from real estate commissions on properties leased by the County, false statements CW1 made to federal agents, failure to report bribes and kickbacks as income on CW1's tax returns, and a detailed accounting of all unreported income and tax due and owing for calendar years 2010 to 2016.

### F.   Discovery

To date, the government has produced over 58,000 pages of discovery and hundreds of audio and/or video recordings of defendant in the government's possession.  Although the government has informed defense counsel that it does not, at present, intend to call CW1 as a witness at trial, the government nevertheless has produced impeachment information regarding CW1 and, in doing so, has already well exceeded its discovery obligations.

With respect to CW1, the government has produced, among other things: (1) all interview reports of CW1; (2) agent notes pertaining to CW1; (3) all audio and/or video recordings of CW1 both in this case and a wholly separate investigation in which CW1 consensually recorded bribe payments from an electrical contractor; (4) CW1's two-

count information and plea agreement, along with reports underlying that plea agreement; (5) CW1's financial records; and (6) interview reports, grand jury transcripts and exhibits (pursuant to a Rule 6(e) order), and other court filings and documents in <u>separate</u> investigations and matters not involving defendant which may contain potential impeachment information relating to CW1.  CW1 has no criminal history (apart from his guilty plea to the two-count information) and has received no financial benefits for CW1's cooperation.

And even before defendant received the aforementioned documents and recordings, defendant was well aware of the potential impeachment information relating to CW1.  In the federal wiretap applications produced to defendant and the complaint against him (<u>see</u> dkt. 1, n.2), the government disclosed impeachment information about CW1, including the fact that CW1 had admitted accepting bribes as a public official and had acknowledged committing, or attempting to commit, bankruptcy fraud and tax fraud in the past.  (<u>Id.</u>)  The government also disclosed that CW1 had admitted to lying to federal agents prior to CW1's cooperation with the Federal Bureau of Investigation ("FBI").  (<u>Id.</u>)  None of this was kept from defendant.

Defendant, however, comes before this Court seeking to compel the production of administrative documents in CW1's confidential source file and CW1's tax returns, none of which is material to his defense or presents any new impeachment information different or distinct from that which is already in defendant's possession.  As detailed herein, his motion lacks merit and should be denied.

///

///

**III. LEGAL STANDARD**

"There is no general constitutional right to discovery in a criminal case." Weatherford v. Bursey, 429 U.S. 545, 559 (1977). There are three sources of the government's discovery obligations in a criminal case. First, Federal Rule of Criminal Procedure 16 ("Rule 16") establishes guidelines for pretrial production by the government of certain limited materials. Second, under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, including Giglio v. United States, 405 U.S. 150 (1972), the government must turn over to the defense evidence in its possession that is exculpatory or favorable to the defendant. Finally, under 18 U.S.C. § 3500 (the "Jencks Act") and Federal Rule of Criminal Procedure 26.2 ("Rule 26.2"), both parties must disclose prior statements by witnesses after the witness has testified. None of these sources authorize "fishing expeditions" or sweeping discovery requests. See United States v. Bagley, 473 U.S. 667, 675 (1985).

The burden lies with the defendant to make a prima facie showing of materiality in order to obtain discovery. United States v. Mandel, 914 F.2d 1215, 1219 (9th Cir. 1990) (citing United States v. Little, 753 F.2d 1420, 1445 (9th Cir. 1984)); United States v. Wong, 886 F.2d 252, 256 (9th Cir. 1989). In establishing materiality, the defendant must do more than specify the items he is seeking, since materiality is "not satisfied by a mere conclusory allegation that the requested information is material to preparation of the defense." United States v. Cadet, 727 F.2d 1453, 1466 (9th Cir. 1984) (quoting United States v. Conder, 423 F.2d 904, 910 (6th Cir. 1970)) (defendant's discovery request that sought documents the government did not intend to use at trial was too far ranging and potentially

12

burdensome); see also United States v. Muniz-Jaquez, 718 F.3d 1180, 1183 (9th Cir. 2013) ("General descriptions of information sought and conclusory allegations of materiality are insufficient."). Even if the defendant has never seen the requested documents, a concrete showing of materiality is still required. United States v. Ross, 511 F.2d 757, 763-64 (5th Cir. 1975). And to make that concrete showing of materiality, a defendant must demonstrate that the evidence would "alter the quantum of proof" in the defense's favor. Marshall, 532 F.2d at 1285.

"[M]aterial to preparing the defense" in the Rule 16 context "means the defendant's response to the Government's case-in-chief." United States v. Armstrong, 517 U.S. 456, 462 (1996). In Armstrong, the Court held that the defendant was not entitled to Rule 16 discovery to support his pretrial motion to dismiss based on selective prosecution. Id. at 463. The Court reasoned that the plain language of Rule 16 makes clear that the term "defense" does not include "any claim that is a 'sword,' challenging the prosecution's conduct of the case," but rather "encompasses only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged." Id. at 462. The Ninth Circuit has additionally held that general descriptions and conclusory arguments are insufficient to show materiality. Marshall, 532 F.2d at 1285. In Brady, the Supreme Court expanded the materiality requirement by requiring the disclosure of evidence that is material to guilt or innocence. Brady, 373 U.S. 83. A Brady claim cannot be based on "mere speculation." Wood v. Bartholomew, 516 U.S. 1, 6 (1995).

13

Significantly, there is absolutely no constitutional requirement for "the prosecution to make a complete accounting to the defense of all evidence in its possession." United States v. Baxter, 492 F.2d 150, 173 (9th Cir. 1973) (citing Moore v. Illinois, 408 U.S. 786 (1972)). Neither is there a right of the accused to rummage through government files. United States v. Williams, 580 F.2d 578, 585 (D.C. Cir. 1978). Ultimately, where a defendant has failed to make the requisite materiality showing and "failed to articulate any substantial reason why he should be entitled to the confidential information, disclosure is not appropriate." United States v. Rowland, 464 F.3d 899, 909 (9th Cir. 2006) (internal quotations and citations omitted).

## IV.  ARGUMENT

### A.  The Government Has Already Produced All Material Information From the FBI's Confidential Source File; Any Remaining Administrative Documents Are Not Discoverable

With respect to CW1's confidential source file, the government has produced the overwhelming majority of it. Anything material to the defense or which otherwise falls within the ambit of the government's discovery obligations has been produced, including most importantly, the source reports for CW1. Nevertheless, defendant has made the exceedingly broad and improper demand for every single piece of paper in CW1's confidential source file. The only items that remain, however, are administrative documents containing no material information apart from what the government already has produced. Defendant's demand exceeds the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law -- in short, it is nothing more than an improper fishing

14

expedition.  See, e.g., Baxter, 492 F.2d at 173; Williams, 580 F.2d at 585.  As such, defendant has failed to meet his burden of demonstrating materiality.

Defendant has provided no case law whatsoever to support his exceedingly broad request for each and every document in CW1's confidential source file, much less articulated any non-speculative basis for why and how the FBI's administrative documents that remain in the source file are material and necessary to his defense, especially given that those remaining documents may reveal confidential law enforcement methods.  Much of what is in the confidential source file is not material to his defense, and any information that is material has already been produced.  For instance, the government has already produced every single source report in the file and all consensual recordings made by CW1.  In addition, defendant has the admonishments given to CW1 and, as detailed above, a wealth of impeachment information.  The government has also produced CW1's two-count information and plea agreement, along with the underlying investigative reports and recordings from the separate investigation in which CW1 recorded bribe payments from the electrical contractor.  From those documents and recordings, as well as CW1's plea agreement, it is clear how, and to what extent, CW1 was utilized to assist in another prosecution.  The government has not produced a criminal history report or report of payments precisely because they do not exist -- CW1 has no criminal history at present and has received no payments in exchange for cooperation.[3]

---

[3] Although CW1 has pleaded guilty to a two-count information in another federal case, he is awaiting sentencing.  As stated, defendant has the information, plea agreement, reports, and recordings related to that case.

There is no additional impeachment information contained in the source file that is different or distinct from what defendant already has in his possession. For instance, defendant requests all FD-209a contact reports, but any material information in such reports about a meeting or contact with CW1 was already documented in the source reports, recordings, or other documents that have been provided to defendant. And where a single FD-209a contact report in this case did contain arguable impeachment information that had not been produced to defendant elsewhere, the government produced that report to comply with its discovery obligations. What remains in the CW1's confidential source file that has not been produced are administrative documents containing no information that is <u>Brady</u>, <u>Giglio</u>, exculpatory to the charges, or that would support defendant's entrapment defense or challenge to the federal wiretap orders.

Defendant has absolutely no legal entitlement to internal FBI administrative records not reflecting statements made by a source, benefits conferred, or other material information. Rule 16(a)(2) exempts "reports, memoranda, or other internal government documents made by...government agent[s] in connection with investigating…the case" from discovery. Fed. R. Crim. P. 16(a)(2).[4] FBI's administrative documents prepared by agents while investigating this case are protected from prying eyes. <u>See</u> <u>United States v. Fort</u>, 472 F.3d 1106, 1115 (9th Cir. 2007); <u>United States v. Ail</u>, No. CR 05-325-RE, 2007 WL 1229415, at *2 (D. Or. Apr. 24, 2007) (denying defendant's motion to compel discovery of the "FBI's internal reports

---

[4] For the purposes of this rule, FBI agents are "government agents." <u>See e.g.</u>, <u>United States v. Walk</u>, 533 F.2d 417 (9th Cir. 1975).

of payments to informants, reports of authorized criminal activity, informant instructions, and concurrence letters prepared in connection with [the] investigation" under Rule 16(a)(2)).

Defendant attempts to demonstrate materiality with nothing more than vague claims that perhaps there is some "additional information undermining the credibility" of CW1 that has not been disclosed. (Dkt. 54 at 7.)  There is not.  Defendant makes the same claim with respect to the wiretap orders -- perhaps there is some information buried in the confidential source file that could have further impeached the credibility of CW1.  (Id. at 8.)  Again, there is none. Defendant's baseless, unsubstantiated suggestion that perhaps there is some nugget of impeachment information deep within CW1's confidential source file is speculative and precisely the type of fishing expedition the Ninth Circuit prohibits.  See, e.g., Baxter, 492 F.2d at 173; Rowland, 464 F.3d at 909; see also Williams, 580 F.2d at 585.  Moreover, the government has already produced a wealth of impeachment information to defendant and disclosed that information to the district court in its wiretap applications and complaint.  It is unclear what defendant could possibly hope to gain that would meaningfully add to any attempted impeachment of CW1 beyond what defendant already has in his possession.

Beyond that, defendant makes the most perplexing argument of all with respect to his entrapment defense -- perhaps "the file does not contain any significant additional information that could be used in support of an entrapment defense" and that this "fact alone would bear on [defendant's] decision as to whether or not to pursue an entrapment defense."  (Dkt. 54 at 9-10.)  But although defendant is perfectly correct that the remainder of the file contains absolutely

17

1   nothing that would bolster his meritless entrapment defense,

2   defendant does not get to rummage through government files just to

3   confirm that there is nothing useful to him.  See, e.g., Williams,

4   580 F.2d at 585.

5       Putting aside defendant's illogical entrapment argument, the

6   thrust of defendant's position seems to be that CW1's credibility is

7   at issue and that the government, possibly, has not disclosed the

8   full breadth of CW1's credibility issues.  (Dkt. 54 at 7–9.)  Beyond

9   the fact that defendant's premise is simply not true and entirely

10  speculative, what is most lacking from defendant's argument is any

11  showing of how the requested documents -- administrative documents

12  remaining in the source file -- would "alter the quantum of proof" in

13  defendant's favor.  Marshall, 532 F.2d at 1285.  Defendant fails to

14  show how the documents would be material to his guilt or innocence.

15  Brady, 373 U.S. 83.  Moreover, information that is "material to

16  preparing the defense" in the Rule 16 context "means the defendant's

17  response to the Government's case-in-chief."  Armstrong, 517 U.S. at

18  462.  Defendant cannot use Rule 16, like he is attempting, as a

19  "sword" to challenge the government's conduct; rather, the

20  information is only material if it "refute[s] the Government's

21  arguments that the defendant committed the crime charged."  Id. at

22  462–63.  It does not.

23      Ultimately, defendant's proffered reasons for needing to see

24  every single piece of paper in the confidential source file fall

25  flat.  They are baseless, speculative, and in no way meet the

26  requisite threshold for demonstrating materiality.  Accordingly,

27  defendant's motion as to the source file must be denied.

28

**B. Congress and the Rules of Discovery Prohibit Disclosure of CW1's Tax Returns, Particularly Because Defendant Again Has Failed to Make a Concrete Showing of Materiality**

Defendant's claims with regard to CW1's tax returns fall victim to similar issues.  With nothing more than vague and speculative allegations of what could possibly be in CW1's tax returns, defendant attempts to demonstrate materiality.  But this type of fishing expedition is completely prohibited both by 26 U.S.C. § 6103, <u>et seq.</u>, and the rules of discovery.

Unlike other documents, an individual's tax returns are generally shielded from discovery pursuant to the confidentiality protections enacted by Congress in Section 6103.  Beyond that, the general rules of discovery apply.  Information is only discoverable to the extent it falls within the ambit of Rule 16, <u>Brady</u>/<u>Giglio</u>, or the <u>Jencks</u> Act and Rule 26.2.  Particularly in light of the congressional mandate in Section 6103, the government simply cannot disclose an individual's tax returns unless and until defendant satisfies his burden of demonstrating materiality and a court orders the production.

Throughout the meet and confer process, the government repeatedly asked defendant to provide any case law or authority whatsoever to support his request for the underlying tax returns of an informant, particularly in a case where, as here, CW1 has already pleaded guilty to Subscribing to a False Tax Return and his plea agreement details his unreported income and tax liability for a seven-year period.  He failed to do so.  And with the instant motion, he fails once more.

Defendant already has the impeachment information needed to satisfy the government's obligations with respect to Rule 16 -- and that is even assuming CW1 were to testify.  From CW1's plea agreement and other discovery produced to defendant, defendant is well aware of CW1's prior false statements, unreported income, sources of unreported income, and tax liability.  Those are the material facts.

For example, in CW1's plea agreement, CW1 admits underreporting income for the years 2010 through 2016.  The plea agreement's robust factual basis outlines, in excessive detail, the amounts of unreported income, the sources of the unreported income, and corresponding tax liability for each of those years.  Discovery provided to defendant details the bribery and kickback schemes of which the government has evidence, as well as the unreported income from those schemes.  Defendant claims that, perhaps, the government miscalculated how much income was underreported.  (Dkt. 54 at 13.) But if the government omitted any of that income in its calculations (it did not), that would be apparent from CW1's plea agreement and the discovery produced to date.  After all, it is apparent from the discovery how much income CW1 failed to report, and if that figure somehow differed from what is in CW1's plea agreement (again, it does not), that discrepancy would be blatant.  Defendant fails to explain how the tax returns themselves would shed any more light on this issue, especially since tax returns only show <u>reported</u> income, not sources and amounts of unreported income.

Beyond that, defendant posits that maybe there is some "other perjured statement or impeachment evidence that are *not* identified in the plea agreement."  (Dkt. 54 at 13.)  Defendant's premise is, again, flawed and entirely speculative.  From all of the disclosures

20

in this case, defendant has ample evidence of prior false statements by CW1, both on this tax returns and to federal agents. The government, not once, has attempted to hide those facts. Defendant utterly fails to show how a single additional false statement (if there even were one) would "alter the quantum of proof" in defendant's favor. Marshall, 532 F.2d at 1285. He fails to show how a single additional false statement, on a tax return no less, would be material to his own guilt or innocence. Brady, 373 U.S. 83. And most of all, he fails to show how the returns themselves could be "material to preparing his defense," as defendant seems to want them only as a "sword" to fight against the prosecution's conduct, not as a "shield" against the government's proof of his guilt. See Armstrong, 517 U.S. at 462–63.

Ultimately, CW1's tax returns are simply not discoverable, as defendant has failed to carry his burden with respect to materiality and particularly in light of Congress's mandate to keep such returns confidential.

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court DENY defendant's motion.

21