ROBERT L. SHAPIRO - CA State Bar No. 43693
GLASER WEIL LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, California 90067
Telephone (310) 556-7886
Facsimile (310) 282-0888
Email: *rs@glaserweil.com*

TENY R. GERAGOS - NY State Bar No. 316142
Email: *tgeragos@braflaw.com*

MARC A. AGNIFILO - NY State Bar No. 2476182
BRAFMAN & ASSOCIATES, P.C.
Telephone (212) 750-7800
Facsimile (212) 750-3906
Email: *magnifilo@bralaw.com*

MATIN EMOUNA - State Bar No. 2727113
EMOUNA & MIKHAIL, P.C.
Telephone (526) 877-9111
Email: MEmouna@Emikla.com

Attorneys for Defendant
ARMAN GABAEE

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>ARMAN GABAEE,<br><br>　　　　　　　Defendant. | Case No. 18-CR-00331-GW-1<br><br>**DEFENDANT'S SENTENCING POSITION, WITH EXHIBITS**<br><br>Sentencing Date: December 15, 2022<br>Court: Hon. George Wu |

Defendant ARMAN GABAEE, through counsel, hereby submits his Sentencing Position, with Exhibits.

Defendant reserves the opportunity to make additional comments at the sentencing hearing in this matter.

Date:  December 6, 2022                Respectfully submitted:


By    /s/ *Robert L. Shapiro*
ROBERT L. SHAPIRO
TENY R. GERAGOS
MARC AGNIFILO
MATIN EMOUYNA

Attorneys for Defendant
ARMAN GABAEE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>TABLE OF CONTENTS</u>

I.  INTRODUCTORY COMMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ACCEPTANCE OF RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . 3

III.  COMMENTS ON THE PRESENTENCE REPORT . . . . . . . . . . . . 5

IV.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
     MILITATE TOWARD A NON-CUSTODIAL SENTENCE. . . . . . . 7

     1.  Arman Gabaee's Relationship with Thomas Shepos. . . . . . . . . 7

     2.  The Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.  THE HISTORY AND CHARACTERISTICS OF THE
    DEFENDANT SUPPORT THE REQUESTED NON-
    CUSTODIAL SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     1.  Family Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     2.  Childhood in Iran. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     3.  Early Years in the United States . . . . . . . . . . . . . . . . . . . . . 14

     4.  Early Work History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     5.  Real Estate Development/Early Days of the
         Charles Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.  CHARLES COMPANY TODAY . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     1.  Interview with Sarah Withers. . . . . . . . . . . . . . . . .. . . . . . . 20

     2.  Interview with Jack Kurchian . . . . . . . . . . . . . . . . . . . . . . . 22

     3.  Thirteen Other Ongoing Projects. . . . . . . . . . . . . . . . . . . . . 23

VII.  ARMAN GABAEE'S PRO-SOCIAL AND PHILANTHROPIC
      ACTIVITIES SHOULD BE GIVEN SUBSTANTIAL WEIGHT
      IN ARRIVING AT A JUST SENTENCE. . . . . . . . . . . . . . . . . . . . 27

VIII.  MARRIAGE, FAMILY AND CHILDREN . . . . . . . . . . . . . . . . . . 33

IX.  ARMAN GABAEE'S HEALTH PROBLEMS SUPPORT A
     MITIGATED SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

i

X.    A REVIEW OF THE §3553(A) FACTORS SUPPORTS
      IMPOSITION OF PROBATION WITH APPROPRIATE
      TERMS AND CONDITIONS IN LIEU OF PRISON. . . . . . . . . . . . . 39

XI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

**Caselaw**

Gall v. United States

    552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Kimbrough v. United States

    128 S.Ct. 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Koon v. United States

    518 U.S. 81, 113 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Pepper v. United States

    562 U.S. 476 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Rita v. United States

    551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Adelson

    441 F.Supp. 2d 506, 512 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . 41

United States v. Booker

    543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Menyweather

    447 F.3d 625, 633 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 40

United States. v. Sachsenmaier

    491 F.3d 680, 685 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Whitehead

    532 F.3d 991, 993 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 40

Williams v. People of the State of New York

    337 U.S. 241, 247 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes**

18 U.S.C. §666(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. §3553(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. §3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. §3661. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. §2B1.1(b)(1)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. §2C1.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. §2C1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. §2C1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. §2C1.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. §§3E1.1(a) & (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

# I.

## INTRODUCTORY COMMENTS

On May 2, 2022, Arman Gabaee, age 61, pleaded guilty to a single count of Federal Program Bribery, in violation of 18 U.S.C. §666(a)(2).  The charge was occasioned by Mr. Gabaee offering and/or paying inducements to Thomas Shepos, a County of Los Angeles employee and a long-time friend.[1]  Mr. Gabaee's purpose in offering the bribes was to persuade Mr. Shepos to help him obtain a new long-term lease with the County of Los Angeles.  Based on the terms of the proposed agreement, the County would lease space for the Department of Public Social Services (DPSS) at a new location adjacent to the Hawthorne Mall, located at 12000 Hawthorne Boulevard, which Mr. Gabaee and his firm, Charles Company, had owned since 2001.  Mr. Gabaee's plan was to then turn the Hawthorne property into a state-of-the-art mixed-use facility and outlet mall.

Mr. Gabaee's contrition is palpable.  An entirely self-made man, he is deeply ashamed of his decision to offer Mr. Shepos the inducements.  His arrest and conviction have brought grief and humiliation to his wife and their four children, all of whom are sincere, hardworking young adults.

Although Mr. Gabaee now finds himself in serious trouble for the first and only time in his life, over the past 40 years, he and the Charles Company have done a great deal of good for Los Angeles.  In addition to his long record of charitable and philanthropic activities, which will be discussed in a subsequent section of this memorandum, Mr. Gabaee and his team have specialized in purchasing and rehabilitating abandoned sites in low-income and industrial areas of the County, including over 100 decommissioned gas stations.  Mr. Gabaee and Charles Company were instrumental in helping South Los Angeles rebuild following the Rodney King riots of 1992.

---

[1] Unbeknownst to Mr. Gabaee, during late December of 2016 and continuing until April of 2017, Mr. Shepos was working as a confidential source for the Government and recorded numerous conversations with the defendant.

In their Letter of Recommendation, the U.S. Probation Office recommends
what is, in effect, a 37-month downward variance under 18 U.S.C. §3553(a).  The
Probation Officer states (see Letter of Recommendation, pp. 4-5):

> In mitigation, Gabaee appears to have some insight into
> why he engaged in the criminal conduct, and his
> motivation for committing the offense…   Gabaee appears
> to be genuinely motivated to change.  In order to make up
> for his conduct, Gabaee waterproofed the windows,
> updated the plumbing, and reconstructed the siding and
> part of the roof at the Union Rescue Mission on Skid Row
> in downtown Los Angeles…
>
> …It appears highly unlikely he would risk his liberty again
> by committing future crimes.  Since he presents a low risk
> of recidivism, the Court need not sentence Gabaee within
> the guideline range in order to provide specific deterrence
> from future criminal conduct or to protect the public from
> Gabaee.
>
> Gabaee has struggled with ADHD since early childhood,
> and this made school very challenging for him.  Despite
> this, he not only completed high school, but completed a
> Bachelor's degree in a foreign country.  Gabaee has had a
> strong work ethic since his childhood years in Iran and has
> maintained employment since 1982….  Among the
> numerous character letters received, Gabaee's penchant for
> helping others with no thought of personal reward or
> recognition was illuminated.

Mr. Gabaee appreciates the Probation Officer's recommendation and the good
faith in which it is made.  He believes, however, as set forth in his Objections to the
Presentence Report, that the Probation Officer's proposed 4-level specific offense
characteristic based on Shepos' purported high rank or authority [as described at
U.S.S.G. §2C1.1(b)(3)] is unwarranted and without merit.[2]  If this Court were to
agree that the aggravated role increase should not be applied, Mr. Gabaee's starting

---

[2] The arguments set forth in Mr. Gabaee's Objections to the PSR, dated
November 17, 2022, are incorporated by reference herein.

point under the advisory guidelines, prior to the Probation Officer's recommended 37-month downward variance, would be either level 25 or level 26, depending on whether he is awarded a 2 or a 3-level reduction for his acceptance of responsibility.

Arman Gabaee is 61 years old.  He is plagued with a multitude of physical problems and suffers from anxiety and insomnia.  A sentence of anywhere close to 60 months would be crippling for the defendant and his family and would serve little purpose.  As the Probation Office points out, Mr. Gabaee poses a "low risk of recidivism."

With this in mind, based on his exemplary history of good works and contributions to the community; his prior unblemished record; his age and health problems; and the fact that he is extremely remorseful and highly unlikely to recidivate, Defendant Arman Gabaee, through counsel, respectfully requests a sentence of 3 years Probation, the first 18 months of which could be served under home confinement, and the agreed-upon fine of $1,149,000.  In addition, the Court may wish to include a substantial community service obligation as part of the sentence.  Such a sanction would effectuate justice in this matter and would satisfy the sentencing factors set forth at 18 U.S.C. §3553(a)(1).

## II.

## ACCEPTANCE OF RESPONSIBILITY

Arman Gabaee deeply regrets his involvement in this crime.  He states in his appended letter:

> Thank you for this opportunity to address the Court.  I am writing to apologize to the Court for the mistake I have made.  I also want to apologize to the Government and to the agents who worked on my case.  The United States has given me the opportunity to build a decent life for my family and my loved ones, and I feel terrible for betraying this great nation's trust.
>
> It is hard to find words, Your Honor, to describe how ashamed I am for having offered and paid inducements to

3

Thomas Shepos when I was trying to obtain a new county lease for DPSS (Department of Public Social Services) in 2017. This is the worst mistake I have ever made.

My company provides direct employment to around 50 individuals and indirect employment to over 1000. Many of them will lose their jobs if I go to prison. I feel awful about my mistakes and apologize from the bottom of my heart.

To make matters worse, my beloved mother Mariam was recently diagnosed with Stage 4 lung cancer. She is now receiving chemotherapy, but the reality is that she has very little time left.

I have never been in trouble with the law before, and I promise you, Your Honor, that I will never do anything like this again.

In order to make up for his conduct to the best of his ability, Arman has taken on the job of waterproofing the windows, updating the plumbing, and redoing the siding and part of the roof at Union Rescue Mission on Skid Row in downtown Los Angeles. In a letter dated July 11, 2022, Andy Bales, the President and CEO of Union Rescue Mission, writes:

I am pleased and privileged to write about Arman Gabaee, who has an upcoming court appearance before your distinguished court.

As a bit of background, I am Reverend Andy Bales, the President, and CEO of Union Rescue Mission in downtown Los Angeles. The Union Rescue Mission is the oldest mission in skid row and has served people devastated by homelessness for 131 years, 28 years in this building. We pride ourselves on the fact that we do not turn away any homeless person. In the past we have relied on the help and support of those we service to help maintain our 5-story building. Unfortunately, over the past several years the building has deteriorated and now requires a tremendous amount of remedial work. In order to achieve the proper repair work, we asked for bids and the best bid

4

we received was $6,000,000, which was way outside our budget.

I am pleased to inform the Court that Arman Gabaee learned of our plight and came to the Mission to discuss how he could be of assistance. Arman and I examined the entire structure and discussed what was necessary to make the building livable and sustainable, which included repairing the windows, the siding and the roof and attending to all necessary plumbing needs.

I then shared with Arman that we had received a bid for $6,000,000, which was beyond what we could afford. Without hesitation Arman agreed to come to our rescue. The next day he sent a crew to attend to our most immediate need which was to repair our roof that had been leaking for the past 7 years. Without his help we would not have been able to do this project. Remarkably, Arman is not charging us for any of the work, labor or materials that will be ongoing for the next 18 months.

Arman has shared with me his current criminal case for which he has accepted responsibility. As a Reverend, I deal with a great many people from all different walks of life. I pride myself on being a good judge of character and I can say without reservation that I believe Arman Gabaee is a sincere, compassionate, and giving human being. As such, I am hopeful that at sentencing, the Court will give all due consideration to the incredible work that Arman has done on behalf of the Union Rescue Mission.

## III.

## COMMENTS ON THE PRESENTENCE REPORT

In the Plea Agreement, the parties stipulate to a total adjusted offense level of 28, prior to the 2 or 3 level adjustment for Acceptance of Responsibility. The parties' stipulations derive from a base offense level of 12 [U.S.S.G. §2C1.1(a)(2)]; a 2-level increase for more than one bribe [U.S.S.G. §2C1.1(b)(1)]; and a 14-level increase based on the value of the bribes [U.S.S.G. §§2C1.1(b)(2), 2B1.1(b)(1)(H)].

5

In the PSR, the Probation Office recommends a 4-level increase pursuant to §2C1.1(b)(3). In his Objections to the PSR (incorporated by reference herein and filed on November 17, 2022), Mr. Gabaee, through counsel, has set forth his arguments as to why the proposed 4-level increase is without merit and should not be adopted by this Court. Los Angeles County Real Estate Division employee Thomas Shepos was neither a "high-ranking public official," nor did he occupy a "sensitive" position based on the definitions set forth in the Application Notes to U.S.S.G. §2C1.1(b)(3). Mr. Shepos's position was that of a mid-level, county functionary. He had only limited authority to negotiate the terms of leases, which were required to go through several levels of additional scrutiny before a proposal was presented to the ultimate decision-maker – the County Board of Supervisors – for approval and contract execution. In short, Shepos had no actual decision-making authority and only supplied limited input; it is the Board that decides whether to approve leases. Therefore, the contemplated 4-level enhancement is not applicable in this matter and should be rejected by the Court.

Should the Court agree that the proposed 4-level increase for §2C1.1(b)(3) is without merit, Mr. Gabaee's total offense level would be either level 26, with a corresponding advisory guideline range of 63 to 78 months, or level 25, with a guideline range of 57 to 71 months, depending on whether Mr. Gabaee receives a 2-level or a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. §§3E1.1(a)&(b).

It appears that the Probation Office is only recommending a 2-level reduction for Mr. Gabaee's acceptance of responsibility because he did not agree to sign the plea agreement until a few days before his trial date. Mr. Gabaee, through counsel, respectfully requests that he be granted the usual 3-level reduction as is typical in the Central District of California, even in cases where the defendant decides to enter a plea shortly before a scheduled trial date.

# IV.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE MILITATE TOWARD A NON-CUSTODIAL SENTENCE

1.    _Arman Gabaee's Relationship with Thomas Shepos_

Arman met Thomas "Tom" Shepos, a Project Manager for the Los Angeles County Real Estate Division, around 1999.  The two men became good friends and when Tom fell in love with a Jewish woman and wanted to marry her, Arman helped him undertake the task of converting to the Jewish faith so that he could marry his fiancée in a traditional Jewish wedding ceremony.  It is noted that for many years Arman and Tom routinely went out to breakfast together on Friday mornings.

Based on what Arman believed was a close and loyal friendship, Tom and his wife were invited into the Gabaee family's home on multiple occasions.  They attended the bar mitvahs and bat mitvahs of all of Arman's children and the brit milah (circumcision) ceremony for Arman's only son Jonathan a week after the boy's birth.  Tom Shepos would also stop by Arman's office every year during the Jewish holidays to simply wish the Gabaee family a happy new year.

Arman has many hundreds of business colleagues and friends in the Los Angeles and Calexico areas.  As the more than 150 character letters received on his behalf clearly indicate, he is held in very high esteem by a large number of people.  However, as is perhaps somewhat typical for members of immigrant groups, Arman's closest friends were mostly immigrants like himself.  In Arman's mind, Tom Shepos was different.  He was American born and bred, and Arman greatly enjoyed his companionship.  He took considerable pride in his friendship with Tom Shepos.

Over time, Arman discovered that Tom's personal conduct was at times perplexing and erratic.  Although Tom presumably earned a good salary working as a Project Manager for Los Angeles County, he often seemed to have financial problems and during the course of their long friendship, Arman occasionally loaned

and/or gave Tom money to help him out of his various financial binds.  As a close
friend, he seldom hesitated to help Tom financially when asked to do so.

It is important to note that during the period leading up to the offense conduct,
Arman and his brother Mark Gabay were experiencing personal and professional
disagreements.  Arman has always been very close to Mark, and he felt extremely
vulnerable over what he perceived as the deterioration of their previously close
fraternal bond.  During this difficult period, Tom came through for Arman and
expressed his sympathy.  Arman is the sort of individual who never forgets a
personal kindness and he was extremely grateful for the care and concern Tom
expressed during this period.

2.    *The Offense Conduct*

Arman met Tom Shepos in about 1999.  During 2000 and 2001, Arman's
company purchased one million square feet of unimproved property located at 12000
Hawthorne Boulevard in the City of Hawthorne.  When Arman and his company
purchased the Hawthorne property, it was an eyesore − an abandoned, gutted former
shopping mall that had been in disuse and disrepair for several years.  In 2001,
Arman's company entered into a long-term lease agreement with Los Angeles
County to build and lease 132,000 square feet of office space to the Los Angeles
County Department of Public Social Services (DPSS).

DPSS ultimately chose the Hawthorne location in part because Arman and
Mark Gabay offered them a below-market rental rate.  Charles Company had
purchased the property for less than market value, which put them in a position to
pass the savings along to their tenants.  It is standard practice for Arman and his
company to negotiate lease agreements that benefit everyone involved; they do this
regularly with other sites, and their lease rates are often below market value.

When Charles Company signed the 12000 Hawthorne Boulevard lease with
the County, Arman had high hopes that they would eventually choose to lease the
remaining vacant space adjacent to the new DPSS offices.  Over the years, Arman

8

even went as far as creating and presenting a chart demonstrating how the County would save $280 million over the span of 30 years if they were to expand with Charles Company, compared to the other possible deals they were pursuing at the time.  The Board of Supervisors ultimately chose to look elsewhere.

As an employee of the County real estate division, Tom Shepos served as the county's Project Manager on the DPSS lease at 12000 Hawthorne Boulevard, but had little to do with the actual leasing of the space which, as set forth in Defendant's Objections to the PSR, went through several layers of review before the County Board of Supervisors made their final decision.  As Project Manager, Tom Shepos's duties included keeping an eye on the construction while serving as a go-between for the City of Hawthorne and Los Angeles County.  As a Project Manager, Tom did not have the power to convince the County to pursue a lease it was not otherwise interested in.

It should be noted that despite the Government's investigation in this matter which began six years ago, with the exception of the Hawthorne lease, Los Angeles County has not moved out of a single building that they have leased from Charles Company.  Nor have they canceled any of their month-to-month leases, which would have been very easy for them to do since they would only have needed to give 30-day notice per the month-to-month agreements.

Arman and his company have never driven "hard bargains" with their lessees and have routinely given them below-market deals.  This has been particularly true with leases to the County of Los Angeles, including the DPSS lease which has always been at below market value.

Between 2001 and the present, the one million square feet at 12000 Hawthorne Boulevard has remained unimproved, with the exception of the 132,000 square foot building leased by DPSS.

During the period preceding the six illicit payments and the promise of a house that are delineated in the Factual Basis of the Plea Agreement (see Plea

Agreement, p. 8), Arman devised a plan that would provide DPSS with more square footage (146,000 square feet), which had been requested by the County of Los Angeles.  The plan would consist of Arman building a new building with all necessary tenant improvements for DPSS at a separate location − 12052 Hawthorne Boulevard.  Arman planned to then fully develop the original one million square feet located at 12000 Hawthorne Boulevard as a mixed-use outlet mall.  It is important to note that under the terms of Arman's company's new proposal to the County, Charles Company would not be seeking additional rent and would move DPSS to the new location at no additional cost to the County.  In other words, Arman's company was offering a deal which over time would save the County a considerable amount of money.

Arman's offer in this instance was typical of his practice of working out leases that were advantageous to everyone involved.  In this case, the County would be getting an excellent under-market deal, while the advantage to Arman and his company was that they would at last be able to fully develop the one million square feet at 12000 Hawthorne Boulevard, which was not realistic as long as DPSS occupied the 132,000 square feet at one end of the property.[3]  Generally speaking, retail companies do not want to be housed next to an entity such as DPSS for fear that close proximity to its semi-indigent clients would negatively affect their own business prospects.

According to the Plea Agreement (see Plea Agreement, pp. 7-8), beginning in 2010 or 2011 and continuing until around April 11, 2017, the defendant paid CW1 (Thomas Shepos) "bribes and kickbacks of approximately $1,000 about every month."  The Plea Agreement specifically states that between December 20, 2016, and April 11, 2017, Arman gave Tom Shepos illicit payments totaling $6,000.  In

---

[3] See Exhibit G for a pictorial mock-up of the proposed mixed-use outlet mall that Arman hoped to build at 12000 Hawthorne Boulevard.

addition, when Tom Shepos asked Arman to help him buy a house/ranch in Northern California, Arman agreed to help and put in bids on two Sonoma County properties.

Arman hoped that in return for the help he was giving Tom Shepos, Tom would do what he could to help expedite the new proposed deal with the County to move DPSS from 12000 Hawthorne Boulevard to a new location at 12052 Hawthorne Boulevard. The irony of this situation is that, as set forth in his Objections to the PSR, in reality Tom Shepos had little influence over who would ultimately receive the new lease.

Arman is fully aware that paying Tom the monthly inducements and taking steps toward helping him obtain a house in return for whatever help Tom could provide in expediting the new proposed DPSS lease was illegal, which is why he has entered a guilty plea to the charge of Federal Program Bribery.

Arman deeply regrets his foolish and self-destructive decision to make the illicit payments to Tom Shepos. His sincere hope is that the Court will weigh this mistake against his remarkable track record of investing in the inner city and providing first-rate properties for lease to the community as a whole. Arman hopes that after weighing these factors, the Court will conclude that Arman's lifetime of good works mitigates against a custodial sentence in this matter.

## V.

## THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT SUPPORT THE REQUESTED NON-CUSTODIAL SENTENCE

In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." <u>Gall</u> at 596-597.

11

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" Pepper v. United States, 562 U.S. 476 (2011) quoting Koon v. United States, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

In keeping with the above, the following social history information about Arman Gabaee is presented to the Court in the spirit of 18 U.S.C. §3661, which states that "no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

1.    *Family Background*

Arman Gabaee was born in Tehran, the capital city of Iran, on April 15, 1961. He is of Iranian Jewish descent.  He is one of three sons of Nouralah ("Norman") and Mariam Gabaee.

Arman's father Norman was born in the tiny village of Khashan in southwestern Iran not far from the Persian Gulf.  When Norman was 12, his parents sent him to Tehran where his grandmother arranged for him to work at the ancient Grand Bazaar.[4]  A willing worker, Norman began by sweeping out and cleaning up the stalls of a number of vendors and transporting their goods back and forth

---

[4] The Grand Bazaar is split into several corridors over 10 kilometers (6.2 mi) in length, each specializing in different types of goods.  In addition to shops, the Grand Bazaar contains mosques, guest houses, and banks.

between the warehouses and their display tables.  During this period, Norman attended night school where he learned accounting.

When Norman turned 17, he started his own small business importing fabrics from England that he would re-sell to textile manufacturers.  He also began importing other products for resale such as bicycles and small household items.  Through the dint of much hard work, by the time he was 24, Norman had saved enough money to get married.

Arman's mother Mariam Gabaee was born and raised in Tehran.  She received minimal education and was introduced to Norman when she was 15.  Mariam married Norman one year later.  Mariam was recently diagnosed with adenocarcinoma of the lung, Stage 4.  She began chemotherapy on November 2, 2022.

Arman's oldest brother Cameron Gabaee was born in 1953.  After immigrating to the United States in 1971, Cameron went into the carpet business where he enjoyed reasonable success.  He married and had six children.  Cameron was struck down by a rare form of thyroid cancer and died in 2003 at the age of 50.  Since then, Arman has supported Cameron's widow and their six children.

Arman's second brother Mark Gabaee is 65.  He and Arman are partners at their real estate development firm, Charles Company.  Mark is married and has four children.

2.    *Childhood in Iran*

Mohammad Reza Pahlavi (the Shah) came to power in 1941 and ruled Iran until the Islamic Fundamentalist Revolution in the late 1970s.  In an interview conducted in the preparation of this memorandum, Arman explained that during the Shah's regime, Jewish people were treated reasonably well by the government.  At the personal level, however, there was discrimination and Arman and his family often had to be discreet about their faith.  Although they were not markedly

13

religious, Arman's family did observe the Shabbat and maintained kosher dietary restrictions.

In an interview, Arman recalled:

> I had a simple childhood. I was very close to my mother who was very sensitive and loving. I was fairly close to my father although I sensed that for some reason, he seemed to favor my older brother Mark.
>
> I took piano lessons and played soccer and enjoyed bicycling. My biggest problem was school. I went to a Muslim public school. The teachers were very strict and although I tried my best, I was never more than an average student. I struggled to read more than a few pages at a time and my comprehension was poor. Because of this, I developed an inferiority complex. Many years later, I learned that I have mild ADHD. One of my goals in life is to someday read an entire book from cover to cover.[5]

Arman had no school on Thursday afternoon and on Fridays. On those days, he went to his father's shop where he would sweep and mop the floors and help out in whatever way he could. During the summer he would work full-time for his father and he soon demonstrated a natural aptitude for sales.

In the early 1960s, Arman's father Norman applied for a visa for his family to come to the United States. The visa was finally approved in 1970 and between 1971 and 1975, the Gabaees visited the United States every year. Arman's older brothers Mark and Cameron attended boarding schools during this period while Arman continued to attend public school in Tehran until he turned 14 in 1975. During these years, Arman's father did well in business and ultimately owned three shops in Tehran that sold blankets, bedspreads and imported carpets.

3.    _Early Years in the United States_

---

[5] It is noted that Arman's reading difficulties are such that he struggles to read his own emails and usually has his senior admin Diane Leckner read them for him.

In 1975, Arman's parents arranged for him to live with his older brothers in an apartment in Fullerton, California.  In his interview, Arman recalled:

> After spending most of the last four years with my mother in Tehran, I suddenly found myself in an apartment 7,500 miles from what had been my home.  It was hard.  My brothers were busy with work and college, and I was basically on my own.  I had to do my own cooking and cleaning.  I spoke virtually no English.  Like many immigrant children in America, I learned my new language mostly from watching cartoons.  I was very lonely and struggled to sleep at night.  I lived in this apartment for the next 3½ years.

Arman attended Troy High School in Fullerton where he was the only Persian Jewish student.  With no one to guide him, Arman assumed that he should "dress up" for school like he would have in Tehran, which resulted in the other kids looking at him like he was crazy.  He recalls that although he was bullied by the other students, many of his teachers took an interest in him and went out of their way to help him adjust both socially and academically.  Arman graduated from Troy High School in June of 1978.

Following high school, Arman took one year of welding classes at California State University, Fullerton (CSUF) and one year of carpentry and automotive classes at Santa Monica Community College.  He then transferred to California State University, Northridge (CSUN) where after several more years of continuing academic struggle, he managed to earn a bachelor's degree in Business Administration with an emphasis on Real Estate in June of 1982.

*4.    Early Work History*

Although Arman struggled greatly in school due to his ADHD, he has always been a willing and industrious worker.  Before ultimately becoming a partner at Charles Company and focusing on real estate development, Arman worked at a variety of jobs, usually in conjunction with his father's various business enterprises.

15

In 1977, Arman's father opened a woven mat factory in Anaheim, California. Based on his welding training, Arman was tasked with repairing the weaving machines when they malfunctioned. The mat factory did not do well and to supplement the family income, Arman and Cameron began buying and selling merchandise at swap meets in Anaheim. Arman remembers:

> After working first at the mat factory and then in a wholesale carpet store on La Cienega, in 1982 I went to work as a driver for a tire distributor in South Los Angeles called Fairmount Tires. I was given a route and a Thomas Guide to navigate by. I spent the next 8 months earning $4 an hour delivering tires to various customers in the South Bay and the San Gabriel Valley. Although this was a fairly simple job, it proved to be a godsend in the long run because while making my rounds, I learned the geography of much of Los Angeles County. This was very beneficial as our family soon segued into real estate development.

5.    *Real Estate Development/Early Days of the Charles Company*

After much consideration and a few false starts, the Gabaee family ultimately found they were a good fit for commercial real estate development. They named their new business Charles Company. In the early 1980s, Charles Company purchased an abandoned bowling alley at Pico and La Jolla, two blocks east of La Cienega.

Arman obtained wheelbarrows and picks and shovels, and he and his team cleaned up the parcel and turned it into a viable commercial real estate site. They converted part of the property into a two-story parking garage. Once the property was ready, they leased 75 percent of it to Pacific Bell and 25 percent of it to Allstate Insurance.

Based on this initial success, Charles Company began to branch out. They acquired various properties in the Pico area as well as a commercial site at 6th and Western that they leased for 65 years from the Weingardt Foundation. It was an old 40,000 square foot brick building that they tore down and replaced with a brand-new

16

two-story strip mall.  Charles Company then leased space to Payless Shoes, 7-Eleven, AutoZone, a pizza shop, a dry cleaners, and a donut store among others.

Arman recalls:

> Part of our business model was to buy up the oddball properties that no one else wanted.  During our early years of operation, we purchased over 100 abandoned gas station sites, most of which were in rough neighborhoods.  We would detoxify the sites and then convert them into small commercial properties.  Throughout this process, I worked closely with the Department of Building & Safety to make sure that everything was being done according to code and followed sound environmental practices.

> Since many of these sites were in the inner city, most banks would not give us construction loans and during our early years, we had to finance our own construction.

## VI.

## CHARLES COMPANY TODAY

Arman Gabaee has now been working in real estate development for approximately 40 years.  During this period, Charles Company has grown exponentially.  It now employs approximately 50 individuals, including seven accountants, at its office location at 9034 W. Sunset Boulevard in West Hollywood, California.  Charles Company is a general partnership.  Arman and his brother Mark Gabay each own slightly less than 50 percent of the business.  Their father Norman Gabaee owns the rest.  Arman personally owns part of 115 different properties.

In order to thoroughly grasp the nature of Charles Company's sphere of operations, undersigned defense counsel interviewed and received character letters from Arman's brother Mark Gabay as well as several of their key employees.  In his interview, Mark Gabay stated:

> Arman is a visionary.  He has the ability to size up a piece of property that may be abandoned, in disrepair, or under-utilized and envision what it could be with proper rehabilitation and new construction.  It is impossible to

17

exaggerate the importance of Arman's contribution to our company.  On our larger projects, he spearheads the design, brings in the architects and works closely with them as they develop the particulars of the project.

In the field at our more than 100 locations, we work with sub-contractors who provide security, maintenance and engineering, and also provide air conditioning, plumbing and electrical work as required.  Without this large team of more than 1,000 individuals, our properties would literally fall apart.  On top of this, we work with engineers, architects, and consultants.  Out of our more than 100 locations, 70 are purely commercial and 11 are residential. The rest of the properties are mixed-use in nature.

If Arman were to go to prison, our company would be paralyzed during his absence for the simple reason that Arman and I are co-guarantors on all the Charles Company bank loans. This is because neither of us has enough income individually to qualify for the loans.  For the loans to be approved, we must combine our income. Therefore, if Arman is incarcerated and is therefore unable to take part in the business, Charles Company will be crippled because the banks will stop loaning us money for major construction loans.

Charles Company has five main building sites for which they currently need construction loans.  All but one of these building sites are fully entitled. Arman's company needs to move forward on these projects because if they don't their entitlements will expire and they will have to start all over again, which would be catastrophic for the company.

The five building sites are as follows:

- **3670 Crenshaw Boulevard**

The Crenshaw site is fully entitled.  It measures 93,000 square feet on the bottom level.  Arman's plan is to turn this location into a mixed-use entity.  When completed, it will include 577 residential units and 88,000 square feet of retail space.

To go forward with this project, Charles Company needs a construction loan of more than $220 million.

- **Melrose Triangle**

The Melrose Triangle site is fully entitled.  This project will result in a mixed-use development totaling 800,000 square feet.  When completed, it will include 80 residential units (30 percent of which will be affordable), 346,000 square feet of office space, and 73,000 square feet of retail space.  A construction loan of approximately $240 million is required to go forward with this project.

- **The Santa Ana Property**

This property is located in the city of Santa Ana near 5th Street and N. Harbor Boulevard.  The Entitlements have been approved and Charles Company intends to build 98 residential units and 6,000 square feet of retail space.  The construction loan will be for around $30 million.

- **The Glendora Avenue West Covina Project**

The Entitlements are nearly finalized.  Arman and Charles Company plan to build 51 apartment units at this site in West Covina across the street from the West Covina Plaza.  The construction loan will be for about $15 million.

- **The Gaffey Street San Pedro Project**

This site is fully entitled and will consist of 23 apartment units.  The construction loan will be for about $5 million.

For Charles Company to survive, it is essential that they apply for the above construction loans quickly so that they can move forward with the building phase of these projects before their Entitlements expire.

It is important to recognize that Charles Company provides gainful employment, either directly or indirectly, to a great many individuals, which in turn enables these individuals to support their families.  If Arman is absent due to a term of imprisonment, many of these employees stand to lose their means of livelihood.

19

Most of Charles Company's locations, including the Hawthorne property located at 12000 Hawthorne Boulevard, are leased at below-market rates. [6]   In fact, Charles Company is known throughout the industry for never driving a hard bargain. Instead, Arman and Mark believe in sharing the benefits in the hope that everyone including their tenants will prosper.

Gene Detchemendy serves as Charles Company's head leasing consultant.  In his letter to the Court, Mr. Detchemendy observes:

> …I met Arman when he was one of the few property developers willing to invest in the urban core of Los Angeles.  As early as the 1980s, Arman actively bought and developed properties no one else was interested in, improving underused sites and pursuing much-needed national tenants including grocery stores, clothing retailers, auto parts stores and other companies…

> Arman's bold vision for the urban environment enabled his business to succeed while at the same time benefitting communities in need.  At a time when no banks would underwrite these developments Arman used his own cash to build; other developers generally did so only after various federal and state subsidies became available.

> After the 1992 unrest, Arman doubled down on bringing new development and tenants to the areas most heavily affected, even as others essentially ran.  He bought and developed properties at Florence and Normandie, La Brea and Adams, and several other impacted locations, bringing renewed hope and development at a critical moment.

> Arman Gabay has invested his time and personal resources to improve the neediest areas of L.A. for decades when few others would, creating meaningful and positive change.  I sincerely hope he continues to have the chance to do so…

*1.*     *Interview with Sarah Withers*

---

[6] It is noted that Arman's desire to update and improve the Hawthorne property is what led to his errors in judgment that triggered the charge against him.

20

Before a company like Charles Company can move forward with its real estate development projects, it must receive Entitlements from the appropriate government agency in the community in which the development is to occur.[7]  Charles Company's employee Sarah Withers is tasked with putting together complete and thorough Entitlement proposals.  In her interview, Sarah explains:

> Before we can start restoring and/or rebuilding a property, we are required to obtain Entitlements from the appropriate government agency.  My job is to put together our Entitlement proposals.  Once the proposal is ready, I pass it on to the proper city agency.  An Entitlement package includes all relevant permit requests, architectural drawings, civil drawings, landscaping and lighting plans and (this is very important) solutions to any environmental issues we may face during the building phase.
>
> I am currently working to get the necessary Entitlements for 27 different projects including our pride and joy, the Gran Plaza Outlet Mall and the Gran Plaza Power Center in Calexico, California.

In her letter to the Court, Sarah Withers adds:

> I have known Arman Gabay for 20 years. I have worked on many of his most complicated and challenging projects. Most of these projects are former contaminated sites, gas stations and located in blighted, high crime and high unemployment areas. The redevelopment of these projects have provided these communities with thousands of new jobs, while eliminating health risks and creating a safe place for residents to live and work.
>
> Throughout the years, I have observed the way Arman treats people. Regardless of who it is, he extends the same respect. He is humble, kind and generous…

---

[7] Entitlements are legal rights conveyed by approvals from governmental entities to develop a property for a certain use, intensity, building type or building placement.

21

As a woman and minority in the field of development, I am grateful and honored that he has given me the opportunity to take a prominent role on his team.  Through his mentorship and trust, I have been able to gain the experience to undertake major projects and grow in my career.

We currently have over 25 critical projects in different stages of planning and development. Many of them are large contaminated and blighted sites that require Arman's hands on approach. I believe that if you look at these projects closely, you will discover how complicated they are and most important how critical his leadership is to redevelop them. I am not certain how we can proceed without him, as he is the backbone that guides and empowers our team, to bring these life changing projects to fruition. We need his guidance and tenacity to get to the finish line.

I respectfully ask for your mercy and pray that you impose the most lenient sentence permitted by law. I wholeheartedly believe that Arman will leave this world a better place.  His legacy will live on through his good deeds and outstanding work.

2.   *Interview with Jack Kurchian*

Jack Kurchian works as a Project Manager at Charles Company.  Among other duties, he is currently working on the Gran Plaza Outlet Mall project in Calexico. Mr. Kurchian describes:

The Calexico site is about 200 acres in all (slightly under 9 million square feet).  The first phase, which consists of about a dozen outlet stores, is complete, with the exception that we are still working on covering the walkways between stores so that it can become a true indoor mall. We are working with architects and civil engineers as we develop plans to fully utilize the rest of the 200 acres.

Pamela S. Danoff-Kraus works at Danoff Kraus Company, LLC, a commercial real estate services company located in Santa Ana, California.  She has

worked on development projects with Arman for approximately 30 years. She states in her letter:

> Arman is extremely hard working as he strives for excellence on every project he develops. He hires some of the most highly respected industry consultants…to give each phase of the project(s) credibility.
>
> Some of the most recent projects that I was involved with are the Gran Plaza Outlet Mall and Gran Plaza Power Center, in Calexico, CA. The outlet mall which was built in 2013 provides approximately 900 job opportunities to the local community. When the balance of the center is built, it will provide approximately 2,895 additional job opportunities. This is an incredible number of jobs which will positively impact the city's economic state. During all this time, Arman has been very supportive of local organizations. For example, the very popular "Art Walk on the Border" is held annually in conjunction with July 4th festivities/fireworks. Over 1,000 local residents participate in this event. Most recently, April 28th, [t]he County requested that they hold this years "State of the County" meeting at the Outlet Mall, which was very well attended.

In addition to providing thousands of job opportunities, the Gran Plaza development will include 1,845 reasonably priced residential rental units.

3.    *Thirteen Other Ongoing Projects*

In addition to the five construction projects described above, the Charles Company is currently developing thirteen other mixed-use (commercial and residential) projects. Architectural plans for all of these new developments have been completed and, in most cases, the necessary Entitlements have been granted. The new projects include:

- **North Hollywood**

The North Hollywood site is 12½ acres where Arman and his company plan to build 730 residential units. The architectural plans have been completed and Charles Company has filed for all necessary Entitlements.

- **Wilshire Boulevard Project – 9111 Wilshire Boulevard**

This location was designated as a Beverly Hills City Landmark in 2016. Charles Company has received the necessary Entitlements to convert this property into a Park Hyatt Hotel. The existing 10-story tower and banking hall will be transformed into 154 guest rooms with restaurant space. Additional parking will be leased from an off-site parking garage.

- **The Sunset Project**

The Sunset Project is located at Sunset and Doheny in West Hollywood. Charles Company has applied for Entitlements to build 95 luxury apartments, 15 moderately priced apartments, and 17,000 square feet of office space. The existing Crosby Building will be preserved.

- **The Monterey Park Project**

This project is still in the architectural phase. Arman's plan is to build 90 residential units and 150,000 square feet of commercial space.

- **The Alhambra Property**

The Alhambra property consists of 12½ acres that need to be decontaminated because it formerly housed an industrial anodizing plant. Once the site has been cleaned and approved for commercial use, 130,000 square feet will be available to lease. Negotiations are under way with Trader Joe's to lease additional space at this location. Charles Company also plans to build 100,000 square feet of public storage at this site. The Entitlements have been approved.

- **Dana Point Development**

The Dana Point development is located at Golden Lantern and the Pacific Coast Highway. It is currently under construction. When completed, there will be 38 residential apartments and 7,000 square feet of retail space.

- **The Diamond Bar Property**

This development, which is located at Golden Springs Drive and Diamond Bar Boulevard, is still in its early stages. The contracts with the architects have been

24

signed.  Arman's plan is to build 295 residential apartments while providing 12,000 square feet of retail space.

- **The El Monte Property**

Charles Company owns 14½ acres located at 3200 Rosemead Boulevard in El Monte.  Home Depot and three other companies have expressed interest in leasing space at this location.

- **The Pacific Palisades Property**

This property is located on Sunset Boulevard in Pacific Palisades.  Charles Company has sought approval to build 49 residential units at this location.

- **The South Grand Avenue Property**

Charles Company has filed for Entitlements to build 295 residential units to be accompanied by 7,000 square feet of commercial space at this location.

- **The Jefferson Property**

Charles Company is in the process of building 30,000 square feet of office space near the intersection of Wellington Road and W. Jefferson Boulevard in South Los Angeles.  At present, the construction is about one-third complete.

- **The Downtown Pomona Project**

Charles Company has applied for Entitlements to build 300 residential units to be accompanied by commercial space in a mixed-use location at W. 2nd Street and S. Thomas Street in the city of Pomona.

- **Irwindale Industrial Park**

Charles Company wants to build a 25-acre industrial park in Irwindale, California.  The city wants the location to include residential units and retail commercial space along with the industrial park.  Plans for this location are being negotiated.

Based on the above thumbnail descriptions (including the Gran Plaza Project in Calexico, California), Charles Company is currently in the process of planning, negotiating, and/or building 19 separate medium-to-large-scale real estate projects in

Southern California.  To complete even one of these projects requires an immense amount of work on the part of Arman and his team.  The amount of work needed to complete all 19 of these projects is staggering.[8]

Although Arman Gabaee readily admits that he made a serious error in judgment in giving funds to Thomas Shepos, the fact remains that Arman, through endless hard work and determination, has done an immense amount of good for Southern California and its residents.  He has routinely taken deteriorating parts of the inner city and transformed them into bustling shopping centers that provide goods and services to the local area residents while providing gainful employment to thousands of individuals.

In his letter to the Court, Richard Lichtenstein, the President and Founder of Los Angeles based public affairs firm Marathon Communications, describes:

> During the past five years I have had the opportunity to work closely with Mr. Gabay and the Charles Company on a variety of land use entitlement matters…  Simply put, I have witnessed Mr. Gabay lead an organization that at all times has been forthright and transparent in its engagements.  Equally impressive has been his commitment to the success of the communities in which he and the Charles Company are working.
>
> The projects we have undertaken with Mr. Gabay…have included everything from adaptive reuse of historic buildings, to ground-up commercial and residential developments that have created hundreds of temporary and permanent new jobs and thousands of new apartments, including scores of affordable units that will house those most in need.
>
> Even more importantly, the Charles Company's Los Angeles projects are located in neighborhoods that traditionally have not attracted investment dollars.

---

[8] Charles Company's work is so complex that it currently has 23 lawyers on retainer.  Most of these lawyers work on Entitlements; 4 or 5 of them work on lease negotiations.

26

In the last few years, Charles Company has branched out into building residential units. If all of the company's projects are allowed to come to fruition, the residents of Southern California will have approximately 4,600 new housing units to choose from, which will help to alleviate the perennial housing shortage that many of these communities face.

If Arman Gabaee had focused solely on his real estate development projects for the last forty years, he would have done a great deal of good for the community. However, Arman has done far more than that. His non-work-related charitable activities during this timespan have been remarkable and are discussed below.

## VII.

## ARMAN GABAEE'S PRO-SOCIAL AND PHILANTHROPIC ACTIVITIES SHOULD BE GIVEN SUBSTANTIAL WEIGHT IN ARRIVING AT A JUST SENTENCE

Although Arman Gabaee's success in real estate development is indeed impressive, he nevertheless remains the humble individual he was raised to be by his unassuming parents. Along with being taught the value of humility, Arman was also taught to give back to the community. Arman took these lessons to heart. Today, he is legendary among those who know him for his uniquely kind nature. Over the years, Arman and his wife Elenor have given freely to individuals, to family and friends, and to worthy philanthropic organizations. In most of the more than 150 character letters received on his behalf, the individuals writing mention Arman's incredibly generous nature.

In his letter, Newport Beach real estate developer Ron Holley describes Arman's empathy for the citizens of the communities in which he works and how his concern for others goes far beyond his "documented obligations." Mr. Holley recounts:

> …while we were building a 287,000 s.f. outlet facility in the City of Calexico, CA the local school district had decided to cut their budget by eliminating playground

27

equipment and facilities in one of the local elementary
schools.  When Arman learned of this…he bought soccer
nets and balls, playground balls, basketball nets and balls
and volleyballs for the kids to use during recess.

We were standing in one of the 3rd grade classes and the
kids were telling us how grateful they were when one of
the kids stated that his family was very poor, but that his
brother was able to get a job at the outlet center and was
very appreciative for our investment in their community.
Within a community that suffers from 16%+
unemployment, that was a big deal for us.

Daniel Juarez, a long-time AYSO volunteer in Hawthorne, California, writes:

Over the years, this man of the Hawthorne community has
underwritten everything from registration and equipment
for low-income players to purchasing heavy-duty air
compressor for our 125+ coaching corps to use to inflate
air into their soccer balls, to funding select soccer teams
with uniforms and transportation costs to participate in
tournaments throughout Southern California and Hawaii.

Michael Kadisha is CEO of a firm developing software tools that address
inequities in college access for low-income students and climate change.  Mr.
Kadisha observes:

Arman has leveraged his success to give back to those less
fortunate.  Together, he and my father have supported
dozens of organizations that provide humanitarian
assistance to families worldwide, and Arman has
consistently been one of the most prolific philanthropists in
Los Angeles.  He is an example to many and has been a
leading voice in enabling his peers to recognize their
responsibility of giving back to less fortunate communities.

Los Angeles resident and philanthropist Shirin Kahenassa comments in his
letter:

He is…incredibly service focused, and has spent countless
hours and resources giving back to those in need and
supporting incredible organizations, such as Hope
Foundation, HOLA (Heart of Los Angeles), Doctors
Without Borders, St. Jude Children's Hospital, Nessah

28

Synagogue, Me to We, and Westwood Transitional Village… For instance, in 2021 when the Westwood Transitional Village needed their academic and art supplies replenished for the families making use of their temporary housing facilities, Arman was the first person who agreed to personally fund and ship all essential academic and art supplies to the kids served by the organization.

Additionally, every year, Arman makes it a point to fully support the work of several of the specialists who treat children with life-threatening circumstances at St. Jude's Children's Hospital… I am proud to say that we have significantly contributed to the quality of life of many families and will continue to work side by side with Arman to make sure that such access remains open to anyone in need who is a patient of St. Jude… His kindness and care know no boundaries.

Caroline Delijani, the President of the Malka Los Angeles branch of Hadassah Organization, writes:

He has raised funds for Nessah Synagogue, he has supported missions of Persian American Women's Conference, he has donated full heartedly to the Hadassah Hospital, Sinai Temple, Sinai Akiba Academy, Iranian Jewish Federation, and Milken Community High School. I am sure the list goes on and on…

Capistrano Beach real estate developer George Ray describes:

I met Arman during a real estate project in Palm Springs for Home Depot in 2007. Arman and his brother, Mark, purchased a landfill site in Palm Springs… Arman, without any firm commitment from Palm Springs for his project, spent hundreds of thousands of dollars to clean up the site. At first, I felt that he was foolish. I would not have done anything with the site until the City of Palm Springs had approved the project… What I learned from this transaction with Arman and from other subsequent projects is that Arman has consistently placed the community's needs over his own self-interest.

Diana Pakdaman has been a teacher at Sinai Temple for over 32 years. She relates in her letter:

29

> …I had the pleasure of teaching two out of four of Arman
> Gabay's children…  Even when his kids were not in my
> class, I could always rely on his generosity to supply
> necessary materials and toys for our classroom.  Arman
> and his wife always volunteered to lend a helping hand
> when we had special events at school.  Most parents who
> were not as busy or successful as Arman would not have
> been so generous with their time and resources as Arman
> and Elenor…

Interventional cardiologist Jack Farahi, M. D. has served the community of

Inglewood, California for the past 27 years.  He attests:

> I have found Mr. Gabaee to be a special person with a great
> deal of compassion, love of others, who is always available
> to help anyone in time of need.  He has helped many in the
> community through his charitable deeds.  I know of many
> who owe their life and health to him.  He has paid medical
> bills for many individuals who otherwise could not afford
> the care they needed.  Without his generosity, I believe that
> many of these individuals would not be here today to be
> with their family and loved one[s].  Mr. Gabaee has truly
> been a life saver.  His charitable deeds have always been
> anonymous and without any fanfare.

Jon Easter is the Vice-President of Culp Construction in Irvine, California.

Mr. Easter reports:

> I met Arman in 2002…  Then in 2008 the Great recession
> hit and the company was on the verge of closing.  I had 16
> young employees that stood to lose everything.  I went and
> met with Arman and explained our situation and that all
> seemed hopeless.  He told me that they were pulling in
> their horns, but to give him a few days and he would see
> what he could do to help.  Being true to his word he found
> enough work over the next few years to keep us afloat and
> saved the livel[i]hood of all my employees…

James L. Arnone is a partner at Lathan & Watkins where he has worked for 32

years.  Mr. Arnone describes in his letter:

> I have long been familiar with how Arman is viewed in the

broader community, and I can assure the Court that Arman
has long enjoyed a reputation of being a man of deep
compassion, who is extremely modest and understated, and
whose word one can trust.

I have especially fond recollections of Arman's deep
generosity when I was part of a team raising funds to build
a new public library, about ten years ago.  Arman was
extremely generous, committing along with his brother
$500,000 for construction of the West Hollywood
Library…  That generosity came at an especially important
time, as private fundraising was very difficult during the
economic malaise following the Great Recession yet it was
a critical component of being able to get the library built.
That library is now a source of great civic pride in the
community…

Kevin L. Pickett, who lives in Los Angeles, writes:

When I think of Arman, I think of his generosity and his
compassion as evidenced by his fervent and consistent
support of my annual Thanksgiving food give away in
South Central Los Angeles…  When Arman learned of my
community outreach…he expressed interest in a manner
that was quite refreshing.  It was not just "here is a check."
Arman evidenced a hearty concern for helping others and
provided generous resources to ensure that for years, no
families were turned away.  I remember seeing his face as
he stood in the background watching the smiles of those
who received their boxes of food…

In addition to his civic philanthropy, Arman has been generous at the personal
level.  His nephew Avi Gabay affirms in a joint letter with his wife Ariella:

Avi's father, Cameron Gabay, passed away twenty years
ago, leaving behind six children and his widow.  The
siblings were from ages five to nineteen.  …Uncle Arman
stepped in as a father figure for the younger siblings and a
mentor to Avi who was nineteen at the time.

When they were still young, Arman would make nightly
check-ins to make sure the children and Mrs. Gabay were
safe.  Not only did Arman include the kids in his family's
Sunday activities, but he made sure they were not alone for

31

> the Holidays and invited them to many Sabbath dinners…
> He was extremely generous financially, and consistently
> showed concern for the family's welfare in many
> areas…  …[E]ducation is very important to Arman, and he
> made sure each niece and nephew was properly schooled
> and educated.

It is noted that Arman and his wife Elenor have paid tuition for his nieces and

nephews at both the primary school and secondary school level, as well as for their

college educations.

Arman's nephew Daniel Gabay remembers:

> In 2003, my father (his brother) passed away which for me
> at age 13 was quite difficult to grasp/understand.  Without
> hesitation, he stepped in and became the father figure that
> not only I needed but for my five other siblings…

Arman's long-time friend, real estate professional Ben Nehmadi,

writes:

> As we traveled to many third world countries such as India
> and Tanzania, I was so impressed and touched by his
> charitable acts.  When we went to bazaars, I would often
> lose track of him, only to find him later kicking a soccer
> ball with children on some side street, sharing jokes, and
> buying them gifts.

Ilana Mokhtarzadeh is a 1031 Exchange mediator.  In her letter, Ms.

Mokhtarzadeh describes Arman's kind and caring response to her second pregnancy:

> During that pregnancy, I had placenta previa, which is the
> condition when the amniotic fluid/sac is in front of the
> child, which can be quite dangerous to the child and mother
> as well.  In the 6th month of my pregnancy, I was taken to
> the emergency room due to a tear in the placenta, and a
> very heavy bleeding that put my life and my son's life in
> danger.  It was a Saturday, and the blood bank was not
> readily prepared to give me the blood infusion that I
> needed urgently.  Arman was one of the three people who
> volunteered and showed up in the hospital to donate his
> blood.  That blood donation was a life saver for my son,
> Adam, and me…

Recent law school graduate Dalai Afa, describes:

> Many years ago when I was about 5 years old my parents went through a very difficult divorce which left my family in a very financially compromised state…. Uncle Arman became very engaged and involved with my Mom's hardships and goals and stepped up to completely support her so that she could go back to school and obtain her lifelong goal of becoming an attorney.

Many additional character letters have been received in which the writers describe Arman's individual acts of kindness in their time of need. These letters are included in the Attachments to this Memorandum.

## VIII.

## MARRIAGE, FAMILY AND CHILDREN

Arman's wife Elenor Gabay, age 51, and her family came to the United States in 1977 just before the Islamic Revolution reached its flashpoint. After attending public schools in Los Angeles, Elenor enrolled at California State University, Northridge (CSUN) in the fall of 1988 as a Communication major. After a year at CSUN, Elenor was introduced to Arman. They soon grew close and were married on August 5, 1990. They have enjoyed a long and fruitful marriage. In her letter, Elenor describes:

> Arman is kind, loving, empathetic, highly sensitive, a deep thinker, and a god fearing soul. Arman has a heart of gold and wears his heart on his sleeve, always with a positive attitude towards life. He is a fair person who has never tried to take advantage of any person or any system. He sees the good in everyone and every circumstance and is never bitter or competitive in any situation. He lives his life based on his morals, his gut instincts and what he senses in his heart. Thankfully, Arman sees his elderly parents every day and is an active caretaker of them both.
>
> Arman never judges anyone or any situation; as a result he easily connects with others and has built meaningful and deep connections with people around him…

33

Arman lost his oldest brother, Camran, nineteen years ago. Camran was also Arman's best friend and closest confidant. Despite his loss, Arman has stayed strong and has been helping support Camran's wife and her six children lovingly and positively. Arman helped put his nieces and nephews through school and has been there for them throughout life's different stages including their everyday needs. He also helps support Camran's 10 grandchildren. Arman and I truly believe that it takes a village to raise good children and his being there for his nieces and nephews and their families is a true testament to that belief.

Arman and Elenor's oldest daughter Nicolette Gabay Hanasab turned 30 in August of this year. She is married to Jonathan Hanasab, age 32. Jonathan works in real estate. They have an 18-month-old son, Pierce Hanasab. Pierce was born with a double hernia, which was surgically corrected when he was 3 months old.

Nicolette holds a master's degree in Digital Marketing. After completing college, she worked with Arman for 4 years. Her main focus was finding tenants to lease commercial space in the Gran Plaza development in Calexico. Since Pierce's birth, Nicolette has focused mostly on caring for her son, while running a small online jewelry business when time permits. Nicolette offers the following perspective in her letter:

My father is…probably the most empathetic person I know. If he hears someone is in need, his first instinct is to get involved and help. He treats everyone the same, it doesn't matter who they are, where they come from, or what they look like.

While we were growing up, Arman taught us to always acknowledge homeless people. To always look them in the eye and say hello. He taught us that they have the same blood and bones that we do and that they are no different than we are; we are all human at the end of the day. My father always keeps food like granola bars, water bottles, and blankets in his car to give to homeless people. I remember my mom one time telling me that my dad pulled over his car in the middle of the night to put a blanket on a

34

1
2
3

man sleeping on the street. When we would pass by anyone homeless, my father would always acknowledge them, say hello, give them money, and whatever food, water, or blankets he had with him.

4     Julia Gabay Beroukhim is 27 years old.  She earned a master's degree in

5 Industrial Organizational Psychology from USC.  Julia works in the leasing

6 department at Charles Company.  Her focus is on finding tenants for their

7 commercial properties.  Like the other Gabay children, Julia is extremely close to

8 Arman.  In her interview, Julia stated:

9
10
11
12
13
14
15

I was a high strung child with a lot of anxiety and my dad specialized in calming me down.  There were no recriminations if I got a bad grade.  I'll never forget the time I accidentally broke a beautiful glass sculpture in our family room.  I was frantic, screaming and crying.  My dad came to my room where I was hiding my head under the pillow.  We talked about it and between sobs, I told him what had happened.  He listened carefully and once he was convinced that it really was an accident, he forgave me completely.

16     Julia further recalls in her letter:

17
18
19
20
21
22

When the pandemic hit, many of our tenants were struggling to pay their rent. Rather than worrying about settling their delinquencies, my father was more concerned about their families… When I would ask my father how to proceed with their debt, many times he would tell me to forgive it. He has the ability to feel what others feel and then goes to great lengths to try and relieve them of their challenges without asking anything in return.

23
24
25

    Arman's only son Jonathan Gabay is 21 years old.  He is about to begin his senior year at USC's Marshall School of Business where he is majoring in Business Administration and minoring in Real Estate Development.  Jonathan writes:

26
27
28

My dad has the utmost integrity and honesty.  He never has anything to hide and is an open book.  ...my dad is constantly looking to give back to his community and others.  We often talk about philanthropic events and organizations we would like to start and different ways we

can help others.  My dad also values education.  When he
was a child, education did not come easy for him.  He
explained to me how he often struggled in school and did
not have the resources in order to get help...  School has
never come easy to me either, and growing up I did not
always receive the best grades.  My dad never pressured
me about my grades but always made sure I was giving it
my best and that I was learning.  My dad is always
involved with my education and still continues to care even
when I am in college making my own decisions.

Arman and Elenor's youngest daughter Lauren is 20 years old.  She is a junior

at USC where she is pursuing a degree in Communications while minoring in

Occupational Therapy Communications.  She states in her letter:

...I have seen my father's generosity and kindness, not just
to me and our family but to the entire community, all
throughout my life and it pains me to see him suffering. I
know my father is a good man who has provided a helping
hand throughout the community.  He is surely no menace
to society.  I hope my letter today can help you see the
amazing man I have the privilege of calling my father.
While considering his sentence, please keep in mind that he
is a wonderful man who has done a great deal of good both
in Los Angeles and in other parts of this great state.

## IX.

## ARMAN GABAEE'S HEALTH PROBLEMS

## SUPPORT A MITIGATED SENTENCE

Arman Gabaee suffers from myriad health problems, some more serious than

others.  He is currently consulting with his physicians, some of whom have written

progress reports which are appended at Exhibit F.

On October 31st of this year, Mr. Gabaee underwent surgery for a massive tear

of his left shoulder rotator cuff.  In his Operative Report, Mr. Gabaee's surgeon

Daniel Kharrazi, M.D. (310/275-5400) provides both a complete postoperative

diagnosis and a description of the procedures that were performed.

36

- **Postoperative Diagnosis**

Left shoulder grade 3 extensive delaminated massive tear of the left shoulder cuff with retraction, with high-grade tear of the intra-articular course of the biceps tendon with bicipital subluxation of the left shoulder.

- **Procedure Performed**

1. Left shoulder double row arthroscopic rotator cuff repair.

2. Arthroscopic biceps tenodesis of the left shoulder.

3. Diagnostic operative arthroscopy of the left shoulder with intra-articular synovectomy debridement followed by extensive bursectomy, decompressive acromioplasty of the left shoulder.

Recovery time for the procedures performed by Dr. Kharrazi is expected to be in the vicinity of 6 to 8 months.

Based on MRI studies, Mr. Gabaee also has worsening osteoarthritis in both knees. Dr. Kharrazi believes that this condition will require a "right knee arthroscopic debridement with subsequent viscosupplementation of his right knee." (See attached medical report by Daniel Kharrazi, M.D.) Dr. Kharrazi believes that Mr. Gabaee's left knee will ultimately require a similar procedure.

Dixie Richards, M.D. (310/826-5949) has been Arman's dermatologist for the last 15 years. She has seen him on a regular basis and has removed a pre-melanoma mole and a basal cell carcinoma from his scalp. Dr. Richards reports:[9]

> Because of his sun exposure and genetic susceptibility, he needs to be followed closely by a skilled dermatologist and lesions need to be removed as soon as possible.
>
> Mr. Gabay has also had condyloma acumuminata and has had various treatments including cryotherapy and medical intervention. The lesions need to be followed every month to six weeks to prevent reoccurrence.

---

[9] See Exhibit F for letters and reports describing Arman Gabaee's health condition.

37

Mr. Gabaee (Gabay) suffers from a variety of troublesome urological conditions.  His urologist B. Robert Bamshad, M.D. (310/854-0777) advises in a progress update:

> Mr. Gabay was recently evaluated for multiple urologic
> conditions.  The patient has significant difficulty voiding
> secondary to benign prostatic hypertrophy (BPH/enlarged
> prostate); he reports bothersome urinary frequency and
> urgency.  Other urologic issues include hematuria (blood in
> the urine) and inguinal hernias.

Dr. Bamshad goes on to state that although Mr. Gabaee's urinary symptoms are currently "marginally managed with daily Tadalafil," he will most likely "require surgical intervention in the near future" and that he was "recently evaluated at UCLA for possible prostatic artery embolization."  Dr. Bamshad concludes by stating that "Mr. Gabay will require close medical monitoring due to the above urologic conditions."

In addition, Mr. Gabaee was recently evaluated by Kenneth Sik-Gen Jung, M.D. (310/665-7200) for foot and ankle pain.  Dr. Jung concluded that there is a reasonable likelihood that Arman's foot and ankle pain can be managed by a conservative treatment plan based on physical therapy and orthopedic support.

Mr. Gabaee also has high cholesterol, pollen-induced allergies that he treats with nasal spray, serious food allergies, and hemorrhoids.  A comprehensive workup by Cell Science Systems, whose headquarters are in Deerfield Beach, Florida, reveals that Mr. Gabaee is severely allergic to apricots and romaine lettuce.  He is moderately allergic to a host of other common foods including acorn squash, apples and black beans.  Cell Science Systems has recommended a 4-day rotational diet, the purpose of which is to nurse his microbiome back to good health.  It is noted that if Mr. Gabaee was sentenced to a term of imprisonment, he would likely be unable to obtain the food he needs to regain adequate digestive health.

Mr. Gabay's current prescriptions include:

> Modafinil -- 200 mg --Take 200 mg by mouth as needed for drowsiness.

38

Sildenafil citrate -- 100 mg -- one time per day for enlarged prostate.

Ativan -- .5 mg -- 1 tablet per day as required for anxiety

Synthroid -- 100 mcg -- 1 tablet per day for underactive thyroid gland

Mr. Gabaae also takes various health supplements on a daily basis.

Mr. Gabaee reports that he struggles with anxiety due to this case and suffers from insomnia two to three nights a week.  If Mr. Gabaee is required to serve a term of imprisonment, his complex medical condition is likely to require regular medical intervention, and if crises arise, emergency treatments at a community hospital that contracts with the BOP (Bureau of Prisons).

Arman's mother Mariam Mahboubeh Gabay has recently been diagnosed with stage 4 metastatic lung cancer.  Mrs. Gabay's physician Arman Hekmati, M.D. (310/281-4999) reports:

> The mother of Mr. Arman Gabay, Mrs. Mahboubeh Gabay (dob: 11/28/1937) is a 84 year old woman who has been under my care for the past 5 years.  She has recently been diagnosed with stage 4 metastatic lung cancer.  She has been undergoing chemotherapy and radiation therapy at Cedars Sinai Hospital.  She will require further cancer treatment for the next 12 months.  The father of Mr. Arman Gabay suffers from significant end stage Parkinson's Disease.  Mr. Arman Gabay is a significant and active care provider for his mother and his presence for his ill mother helps Mrs. Gabay to fight her cancer.  Mr. Arman Gabay's absence will certainly have detrimental negative consequences to Mrs. Mahboubeh Gabay's health.

## X.

## A REVIEW OF THE §3553(A) FACTORS SUPPORTS IMPOSITION OF PROBATION WITH APPROPRIATE TERMS AND CONDITIONS IN LIEU OF PRISON

Under the principles set forth in United States v. Booker, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are now, of course, purely advisory.  The Guidelines are one among a number of factors that sentencing courts are directed to

assess in imposing a sentencing that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).  Neither §3553(a) nor Booker suggests that any of these factors is individually paramount.  All of them, however, are controlled by §3553(a)'s mandate to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions from various circuit courts have clarified the role and approach of the sentencing court in the post-Booker era.  The Ninth Circuit has held that "Booker empowered district courts, not appellate courts.... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing."  United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).   The Ninth Circuit has also determined that in weighing the sentencing decisions of a district court, the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable.  United States v. Menyweather, 447 F.3d 625, 633 (9th Cir. 2006).

Further, the Seventh Circuit has stated that post-Rita "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline sentence."  United States. v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007) (referencing Rita v. United States, 551 U.S. 338 (2007)).

The sentencing range, as calculated by the Probation Officer in this case, highlights the importance of the Supreme Court's ruling in Booker that the guidelines be viewed as merely advisory.  A sentencing court's authority "to reject … the advice of the guidelines," Kimbrough v. United States, 128 S.Ct. 577 (Scalia, J., concurring), has particular relevance here.  The loss table at U.S.S.G. §2B1.1 can be a blunt instrument ill-suited to the wide range of crimes to which it applies.  Moreover, "the guidelines' fetish with abstract arithmetic" fails to consider the devastating effect "that guideline calculations can visit on human beings if not

40

cabined by common sense." United States v. Adelson, 441 F.Supp. 2d 506, 512 (S.D.N.Y. 2006).

A case that is particularly germane to the matter before the bar is Gall v. United States, 128 S.Ct. 586 (2007). In Gall, the district court judge sentenced the defendant Brian Gall to probation, despite an advisory Guidelines range calling for several years of prison. The rationale for this sentence was based on, among other things, the defendant's relative youth and the fact that with the exception of the criminal conduct at issue in that case, the defendant's adult life was filled with substantively positive deeds. He received uniform praise in sentencing letters for his character and work ethic, he had no other criminal record, he was unlikely to re-offend, and he was contributing positively to society. The district court's sentencing determination in Gall was, thus, largely influenced by the "history and characteristics of the defendant." With the exception of his criminal conduct at issue in the case, Mr. Gall had lived a very good life. He was a good person doing good things, a positive force in the community, who was unlikely to ever re-offend.

In the case of Arman Gabaee, as set forth in detail in this memorandum and the 100-plus character letters that are attached, he too has lived a life characterized by an excellent work ethic and "substantively positive deeds." Moreover, based on the fact that he is much older than Brian Gall was at the time of his sentencing, Mr. Gabaee has had an additional 30 years to make a positive mark in the community both through his real estate development ventures and his philanthropic work. Like Mr. Gall, Arman Gabaee has never been in trouble with the law before, and as the United States Probation Officer points out in her Letter of Recommendation that, "It appears highly unlikely he would risk his liberty again by committing future crimes."

In requesting a non-custodial sentence with a suitable amount of home confinement, the agreed-upon fine, and extensive community service for Mr. Gabaee, it bears emphasis that probation with these stringent conditions hardly constitutes a

41

"slap on the wrist."  Rather, it is real punishment and a "substantial restriction of [his]

freedom."  In the majority opinion in <u>Gall</u>, Justice Stevens wrote:

> At the end of both the sentencing hearing and the
> sentencing memorandum, the District Judge reminded Gall
> that probation, rather than "an act of leniency" is a
> "substantial restriction of freedom."  *Id*., at 99, 125.

In his own memorandum, the District Court judge in the case had emphasized:

> Gall will have to comply with strict reporting conditions
> along with a three-year regime of alcohol and drug testing.
> He will not be able to change or make decisions about
> significant circumstances in his life, such as where to live
> or work, which are prized liberty interests, without first
> seeking authorization from his Probation officer or,
> perhaps, even the Court.  Of course, the Defendant always
> faces the harsh consequences that await if he violates the
> conditions of his probationary term.  *Id*., at 125.

Should he be granted a sentence of probation, Mr. Gabaee will face this same

"substantial restriction of freedom."  For a long time, there was an attitude in Federal

jurisprudence that a sentence of probation was somehow "getting off easy" and that

imprisonment was necessary in virtually every case.  The era of this overly

mechanical approach to sentencing is largely in the past, and District Courts now

have the discretion to do what is right rather than simply paying lip service to the

sentencing guidelines.  Based on the totality of the factors present in this matter, it is

clear that just punishment can be achieved by a combination of probation, a

substantial period of home confinement, a fine, and a protracted community service

obligation.

<u>Gall</u> sends the unmistakable message that a defendant's "history and

characteristics," and all of the other §3553(a) factors, really do matter and, in the

right case, can tip the scales toward probation or a significantly reduced prison term.

There are unquestionably cases where incapacitation is necessary to protect the

public from further crimes on the part of predatory defendants.  This is not one of

them.  Arman has never been in trouble with the law before.  Not only does he not

pose a danger to others, but conversely, he has contributed greatly to helping others.
This is truly an instance in which it is to society's benefit to punish this defendant in
a manner that still allows him to care for his family while continuing to work, pay his
fine, and serve the community.

Mr. Gabaee does not need to be locked up to deter him from committing
further crimes for the simple reason that he will never recidivate. This contrite
individual does not need to be incapacitated because he poses absolutely no threat to
society. On the contrary, he is clearly an asset to the community and should be
allowed to continue to play a positive role in his day-to-day activities both in the
workplace and at home with his family.

## XI.

## CONCLUSION

Defendant Arman Gabaee, through counsel, respectfully requests imposition
of 3 years probation, with a requirement that he serve the first 18 months under home
confinement, along with payment of the agreed-upon fine of $1,149,000. The Court
may also wish to include a community service order as a form of societal
recompense, requiring Mr. Gabaee to put water back into the public well. A
sentence along these lines would effectuate justice in this matter and would satisfy
the sentencing factors set forth at 18 U.S.C. §3553(a)(1), while recognizing the
overall good and productive life that Mr. Gabaee has led and the self-rehabilitation
that is well underway.

Date: December 6, 2022                    Respectfully submitted:


                                  By      /s/ *Robert L. Shapiro*
                                          ROBERT L. SHAPIRO
                                          TENY R. GERAGOS
                                          MARC AGNIFILO
                                          MATIN EMOUYNA

                                          Attorneys for Defendant
                                          ARMAN GABAEE

43