E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-4443/8452
     Facsimile:  (213) 894-0141
     E-mail:    lindsey.dotson@usdoj.gov
                thomas.rybarczyk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-00331-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: December 15, 2022 |
| ARMAN GABAEE, | Hearing Time: 8:00 a.m. |
| aka "Arman Gabay," | Location:    Courtroom of the |
| Defendant. | Hon. George H. Wu |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Lindsey Greer Dotson and Thomas F. Rybarczyk, hereby files its sentencing position for defendant ARMAN GABAEE.

     The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the government exhibits filed in support of its sentencing

1  position, and such further evidence and argument as the Court may

2  permit.

3  Dated: December 7, 2022              Respectfully submitted,

4                                       E. MARTIN ESTRADA
                                        United States Attorney
5
                                        SCOTT M. GARRINGER
6                                       Assistant United States Attorney
                                        Chief, Criminal Division
7

8                                       _____/s/ Lindsey Greer Dotson_____
                                        LINDSEY GREER DOTSON
9                                       THOMAS F. RYBARCZYK
                                        Assistant United States Attorneys
10
                                        Attorneys for Plaintiff
11                                      UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2    DESCRIPTION                                                          PAGE

3    I.    INTRODUCTION.................................................1

4    II.   STATEMENT OF FACTS..........................................3

5          A.    Defendant ARMAN GABAEE.................................3

6          B.    Public Official Thomas Shepos.........................3

7          C.    The Monthly Cash Bribes: Defendant Keeps Shepos on
                 Retainer, Paying Him $1,000 Per Month for Seven Years,
8                in Exchange for Lucrative County Leases and Other
                 Benefits..............................................4
9
          D.    The Million-Dollar Home Bribe: Defendant Offers Shepos
10               a Million-Dollar Home in Exchange for a $45 Million
                 Lease.................................................4
11
          E.    Defendant's Other Corrupt Dealings: Separate and Apart
12               from Shepos, Defendant Engaged in Corrupt Dealings
                 With Public Officials to Benefit Himself and Those
13               Close to Him..........................................7

14                1.    Defendant Wants to Discreetly "Pay" for a Public
                        Official to Secure Funding for His Calexico
15                      Project Despite Knowing That Such Payment Is
                        Prohibited......................................7
16
                  2.    Defendant Secretly Solicits Tax Benefits From
17                      Public Official 1, Whom He Financially
                        Compensates in Return...........................9
18
                  3.    Defendant Generally Donates to Public Officials
19                      Intending to Influence Official Acts and Receive
                        Favorable Treatment in Return..................10
20
     III. ARGUMENT....................................................11
21
          A.    The Guidelines Calculation: Defendant Has a Total
22               Offense Level of 30 and Guidelines Range of 97 to 120
                 Months...............................................12
23
          B.    The Nature, Circumstances, and Seriousness of the
24               Offense Warrant a Meaningful Guidelines Sentence of
                 108 Months...........................................14
25
          C.    Defendant's History and Characteristics Are
26               Aggravating, Not Mitigating, and in No Way Justify a
                 Downward Variance....................................17
27
          D.    General Deterrence Is Paramount in Public Corruption
28               Cases to Promote Respect for the Law and Deter Future

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

        Crimes...................................................21

    E.   A Below-Guidelines Sentence Will Create Unwarranted
        Sentencing Disparities, Perpetuating Notions of a
        Two-Tier System of Justice for White-Collar Defendants...24

IV.  CONCLUSION.................................................27

1

<u>**TABLE OF AUTHORITIES**</u>

2    <u>DESCRIPTION</u>                                                              <u>PAGE</u>

3    <u>Gall v. United States</u>,
         552 U.S. 38 (2007).....................................18, 19, 20
4

5    <u>United States v. Bistline</u>,
         665 F.3d 758 (6th Cir. 2012)...............................20

6    <u>United States v. Bragg</u>,
         582 F.3d 965 (9th Cir. 2009)...............................20
7

8    <u>United States v. Brown</u>,
         880 F.3d 399 (7th Cir. 2018)...............................21

9    <u>United States v. Esquenazi</u>,
         no. 09-CR-21010-JEM (S.D. Fla. 2011).......................25
10

11   <u>United States v. Jument</u>,
         no. 09-CR-00397-HEH (E.D. Va. 2010)........................25

12   <u>United States v. Mangano</u>,
         no. 16-CR-00540-JMA (E.D.N.Y. 2022)........................25
13

14   <u>United States v. Martin</u>,
         455 F.3d 1227 (11th Cir. 2006).............................21

15   <u>United States v. Morgan</u>,
         635 F. App'x 423 (10th Cir. 2015)..........................21
16

17   <u>United States v. Mueffelman</u>,
         470 F.3d 33 (1st Cir. 2006)................................22

18   <u>United States v. Musgrave</u>,
         761 F.3d 602 (6th Cir. 2014)...............................23
19

20   <u>United States v. Nuru</u>,
         no. 21-CR-490-WHO (N.D. Cal. 2022).........................25

21   <u>United States v. Peppel</u>,
         707 F.3d 627 (6th Cir. 2013)...............................18
22

23   <u>United States v. Prosperi</u>,
         686 F.3d 32 (1st Cir. 2012)................................20

24   <u>United States v. Rezko</u>,
         no. 05-CR-00691-AJS-4 (N.D. Ill. 2011).....................25
25

26   <u>United States v. Spano</u>,
         411 F. Supp. 2d 923 (N.D. Ill. 2006)....................17, 22

27   <u>United States v. Stefonek</u>,
         179 F.3d 1030 (7th Cir. 1999)...........................20, 24

28

i

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

<u>United States v. Toy</u>,
      no. 14-CR-00023-RBS (E.D. Va. 2014)...........................25

<u>United States v. Treadwell</u>,
      593 F.3d 990 (9th Cir. 2010)................................24

<u>United States v. Velasco</u>,
      849 F. App'x 645 (9th Cir. 2021)...........................12

<u>United States v. Vrdolyak</u>,
      593 F.3d 676 (7th Cir. 2010)................................18

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3          Defendant ARMAN GABAEE built a real estate empire -- not by

4    playing by the rules -- but by corrupting them.  For seven years,

5    defendant bribed a high-level Los Angeles County ("County") public

6    official named Thomas Shepos with monthly cash payments in exchange

7    for lucrative County leases.  Then, in 2016, defendant sought to

8    further exploit the corrupt arrangement, this time soliciting

9    Shepos's help obtaining a **$45 million County lease** for his Hawthorne

10   Mall property -- a lease he believed would increase the value of his

11   property ten-fold.  In exchange for Shepos's assistance, he offered

12   to buy Shepos a million-dollar home.  When Shepos hesitated, even

13   telling defendant in a recorded meeting "don't do anything,"

14   defendant pressed harder.  He told Shepos that if Shepos delivered

15   yet another County lease for a property defendant owned in Pomona,

16   the bribe would only get "better" -- even "better" than the million-

17   dollar Northern California home.

18         Separate and apart from the seven-year Shepos bribery scheme,

19   two court-authorized wiretaps laid bare defendant's web of corruption

20   and deceit, making clear that his bribery scheme with Shepos was

21   hardly an aberrant poor choice.  In dealings unrelated to Shepos,

22   defendant talked about trading financial support for official acts

23   and political favors.  He also took great pains to conceal these

24   dealings, for instance, telling people not to discuss matters on the

25   phone or to disguise the true purpose of an otherwise illegal

26   campaign donation so that it could pass the "smell test."

27         For the Shepos bribes, a federal grand jury indicted defendant

28   with three counts of Honest Services Wire Fraud (18 U.S.C. §§ 1343,

1346) and two counts of Federal Program Bribery (18 U.S.C. § 666).
Just one week prior to trial, defendant pled guilty to count four for
the million-dollar home bribe.  With a Total Offense Level of 30 and
Criminal History Category I, defendant's United States Sentencing
Guidelines ("Guidelines") range is 97 to 120 months.

To adequately punish, deter, and signal that public corruption
offenses carry meaningful consequences, **a Guidelines sentence is
imperative.**  Defendant was a wealthy power broker with an impressive
real estate portfolio.  His seven-year spree of monthly cash bribes,
culminating in a massive million-dollar bribe, was not borne of
financial or emotional desperation -- but immense, deliberate, and
almost unfathomable greed.  He had everything, and yet it was never
enough.  Contrary to his portrayal in his sentencing position[1], he
was no Robin Hood breaking the law to serve the County's less
fortunate or (as he claims without any evidence) leasing property to
the County at below-market rates.  He was the Sheriff of Nottingham,
bribing the nobles to steal from the poor taxpayers solely to line
his own pockets in a futile effort to sate his unquenchable greed.

Having significantly undermined the public's faith in its
political institutions, notions of fair play and justice, and the
County's trust in the integrity of its own processes, defendant has
earned a mid-range Guidelines sentence of 108 months' imprisonment,
three years' supervised release, and a fine of $1,149,000, which he
agreed to pay in his plea agreement.  Anything less, particularly
given the numerous aggravating factors here, would signal a two-tier

---

[1] See, e.g., dkt. 268, p. 14 n.6 (alleging that defendant's
"desire to update and improve the Hawthorne property," apparently not
greed or profit, "is what led to his errors in judgment that
triggered the charge against him"); see also id. at pp. 1, 8-11.

2

system of justice where wealthy and powerful white-collar defendants fair better than defendants of lesser means and status.

## II.   STATEMENT OF FACTS[2]

### A.   Defendant ARMAN GABAEE

Defendant was a prominent real estate developer who conducted business with the County and other local governments.  He was the co-managing partner and co-founder of the Charles Company, a real estate firm that developed commercial and residential real estate projects.  He was also a partner of M&A Gabaee, among other entities.  One facet of defendant's business involved obtaining lucrative contracts whereby the County would lease property owned by defendant.

### B.   Public Official Thomas Shepos

Shepos was a public official in the County's Real Estate Division where he negotiated leases between private property owners and County departments.  He requested and received proposals from private real estate developers, like defendant, who wanted to lease their buildings to County departments.  He negotiated lease terms and drafted lease agreements or directed others to do so.  Based on Shepos's level of seniority, Shepos had significant autonomy to contractually bind the County.  He had authority to negotiate contract terms on behalf of the County, although final contract approval lay with the Board of Supervisors.  Shepos also had authority to approve change orders on contracts.

---

[2] The Statement of Facts is based on the factual basis in defendant's plea agreement and government exhibits filed in support of its sentencing position.  The exhibits are primarily recorded conversations and corresponding transcripts or translations.  The recordings are referred to by their intended trial exhibit number.  The transcript is the exhibit number followed by an "A."  For foreign language recordings, the translation is the exhibit number followed by a "B."

C. __The Monthly Cash Bribes__: **Defendant Keeps Shepos on
Retainer, Paying Him $1,000 Per Month for Seven Years,
in Exchange for Lucrative County Leases and Other Benefits**

Beginning in 2010 or 2011, and continuing until April 11, 2017, defendant paid Shepos bribes and kickbacks of approximately $1,000 or more every month in exchange for the following: (a) Shepos providing non-public County information to defendant; (b) Shepos resolving issues between defendant and County departments or agencies on terms favorable to defendant; and (c) Shepos helping to secure County leases for defendant and negotiating terms in those leases that were beneficial to defendant. From December 2016 (when Shepos began cooperating with the FBI) to April 2017, recorded meetings captured defendant paying Shepos a total of $6,000 in cash over a series of monthly payments. Defendant acknowledges that all of the cash payments to Shepos over nearly seven years were bribes and kickbacks.

D. __The Million-Dollar Home Bribe__: **Defendant Offers Shepos
a Million-Dollar Home in Exchange for a $45 Million Lease**

One of the County leases defendant sought was for the Hawthorne Mall, which defendant owned and was redeveloping. Beginning in 2016, defendant sought a contract through which the County would lease office space in the mall for the Department of Public Social Services ("DPSS") and other County departments or agencies (the "DPSS Lease"). As drafted, the DPSS Lease anticipated a term of 10 years and payments to defendant's company, in the form of rent and tenant improvements reimbursable by the County, in excess of $45 million.

Defendant wanted the DPSS Lease, not just because of the $45 million he would receive in rent over the next 10 years, but because an even more massive payday lay on the horizon. Recorded phone calls

4

1   and meetings with numerous individuals reveal defendant's true

2   purpose in seeking the DPSS Lease.  With a long-term, reliable tenant

3   like the County anchoring the mall, defendant believed he could get

4   bank loans to redevelop the property, attract other tenants, and

5   ultimately increase the mall's assessed value from $17 million to

6   **$500 million.**  (See, eg., Gov't Exs. 115, 115A, 121, 121A, 122, 122A,

7   136, 136A, 314, 314B, 318, 318A, 330, 330A.)  Indeed, the day after

8   Shepos delivered the DPSS Lease to defendant on April 11, 2017,

9   defendant contacted an individual about selling the Hawthorne Mall.

10  (Gov't Exs. 334, 334A.)  With a "signed lease" from the County,

11  defendant recognized that the value of the mall had increased

12  significantly and considered capitalizing by selling.  (Id.)

13      Accordingly, given the value he ascribed to the DPSS Lease,

14  defendant attempted to bribe, and did bribe, Shepos with both the

15  monthly cash payments and the offer of a million-dollar home in

16  Northern California.  In exchange, defendant sought to have Shepos

17  perform various official acts related to the DPSS Lease including:

18  (a) Shepos exerting pressure on County departments to complete and

19  submit Space Request Evaluations ("SREs"), an official request for

20  office space that would have allowed Shepos to begin more formal

21  lease negotiations with defendant; (b) Shepos pretending to publicly

22  engage in the normal County bidding process for County leases, but in

23  fact, promising defendant that CW1 would give defendant favorable

24  treatment to ensure that defendant received the DPSS Lease; (c)

25  Shepos exerting pressure on a subordinate employee ("County Employee

26  1") in the Real Estate Division to draft the DPSS Lease for

27  defendant, and to do so expeditiously and no later than August 2017;

28  (d) Shepos using his influence to pressure County Employee 1 to draft

5

the DPSS Lease in such a way that it "looked good on paper," meaning
that it did not appear suspect or raise concerns; (e) Shepos using
his influence to pressure DPSS to agree to the terms in the DPSS
Lease; and (f) Shepos obtaining the signed DPSS Lease for defendant.

To entice Shepos and ensure that he would steer the DPSS Lease
defendant's way, defendant handed Shepos a menu of real estate
listings during one recorded meeting and made clear that Shepos could
have his pick of any one of the million-dollar properties.  (Gov't
Exs. 37, 151, 151A.)  When Shepos seemed resistant to the Northern
California property purchase, defendant pushed harder, even dangling
the possibility of a "better" bribe if Shepos delivered yet another
lucrative lease, this time for a property defendant owned in Pomona:

> DEF:    How's uhh...for the Northern Cal, should I start
>         looking or...
>
> SHEPOS: No, don't do anything.
>
> DEF:    **If you do Hawthorne, we can do this.  Remember you
>         wanted to buy that ranch?**
>
> SHEPOS: Hahaha.
>
> DEF:    **I'm serious, I'm not joking with you.  You do
>         Pomona, it only gets better.**

(Gov't Exs. 125, 125A; <u>see, e.g.,</u> Gov't Exs. 124, 124A (regarding
defendant's efforts to secure a County contract in Pomona).)

Ultimately, defendant's offers to buy Shepos a home (or "ranch"
as he called it) were not mere puffery.  He first offered to buy
Shepos a $1,199,000 home on Barnes Road in Santa Rosa, California,
but upon learning that it was already in escrow, he turned his eye
toward another property.  In April 2017, he placed not one, but two,
purchase offers on a home on Annadel Heights Drive.  The first offer
was for $1,035,000 and the second for $1,065,000.  Defendant intended

1  to purchase the Annadel Heights Drive property for Shepos but
2  rescinded his second offer mere hours after FBI agents knocked on his
3  door and told him that they knew of his bribes to Shepos, thereby
4  exposing his consciousness of guilt from the outset.

5  **E.   Defendant's Other Corrupt Dealings: Separate and Apart from**
6  **Shepos, Defendant Engaged in Corrupt Dealings With Public**
7  **Officials to Benefit Himself and Those Close to Him**

8  Beyond defendant's bribes to Shepos, the wiretaps revealed
9  evidence of defendant's corrupt dealings with other public officials,
10 separate and apart from Shepos.  Below are some examples.

11 **1.   Defendant Wants to Discreetly "Pay" for a Public**
12 **Official to Secure Funding for His Calexico Project**
13 **Despite Knowing That Such Payment Is Prohibited**

14 On March 29, 2017, agents intercepted a phone call between
15 defendant and one of his lobbyists, Lobbyist 1, in which defendant
16 states that he is willing to pay a public official who has access to
17 Section 108 funds[3] in order to secure that public funding for
18 defendant's real estate development in Calexico, California:

19 DEF:  So, I, here's what I need from you, very badly, and
20        I'm kind of getting very, very desperate.

20 LOB1: I like it when you are desperate.  Yeah.  I'm
21        kidding.

22 DEF:  I know.  I am very desperate.  Anyways, huh, I, I'm,
23        I'm tired of having hallway sex.  You know what the
        hallway sex is?

24 LOB1: No, what's that?

25

26 [3] According to the United States Department of Housing and Urban
27 Development, Section 108 provides "a source of financing for economic
   development, housing rehabilitation, public facilities, and other
28 physical development projects.  "https://www.hudexchange.info/
   programs/section-108/section-108-program-eligibility-
   requirements/#overview" (last visited January 27, 2020).

1    DEF:   Fuck you.  **Anyway.  Um, I need Section 108 money for
            Calexico, and the State has Section 108 allocation.**

2    LOB1:  Mm hmm.

3    DEF:   I called [Public Official 2], and he didn't return my
            call.

4    LOB1:  Oh.

5    DEF:   I used to be good friends with him.

6    LOB1:  Why didn't he return your call?

7    DEF:   I don't know.  He's probably friends with [Individual
            2], and [Individual 2] hates my guts.

8    LOB1:  **Okay.  So you want to try to find someone with
            Section 8 [108] money?**

9    DEF:   **I need somebody who's got huevos and power to** -- I
            don't have to kiss their ass either -- and say, "hey,
            I'm going to get you this," and boom, get it done.

10   LOB1:  **Well, let me ask you a question, because I think this
            is, this is, uh, a very honest question though.  <u>Are
            you willing to pay to do that?</u>**

11   DEF:   **<u>Fuck yeah</u>.**

12   LOB1:  Okay.

13   DEF:   **But I rather, I, I rather figure out a way to pay a
            success fee because it's black and white.**  It's not
            something whether you get it or not.  It's allo...

14   LOB1:  I, but I.

15   DEF:   ...cation is there.  Somebody is just going to have
            to boom, get it.

16   LOB1:  **But I think the FPPC[4] does not allow success fees.**
            I know.

17   DEF:   I know that.

18   LOB1:  Down here.

---

[4] The California Fair Political Practices Commission ("FPPC")
has primary responsibility for enforcing the Political Reform Act,
which in turn, "regulates campaign financing, conflicts of interest,
lobbying, and governmental ethics."  http://www.fppc.ca.gov/about
(last visited January 27, 2020).

8

1    DEF:   I know that.

2    LOB1:  Okay.

3    DEF:   **But, but, but what we can do, do, do an agreement,
             you know, that I don't know we pay, uh, there's ways
4            to do it.  Let me put it this way.**

5    LOB1:  **I hear you.  Okay, as long as we're not calling it
             what it is though, I think we're okay.**
6
     DEF:   **No, no, no.  That's what I'm saying.  There are ways
7            to do it that pass the smell test.**

8    (Gov't Exs. 385, 385A.)

9              2.    Defendant Secretly Solicits Tax Benefits From Public

10                   Official 1, Whom He Financially Compensates in Return

11        On March 1, 2017, agents intercepted a call between defendant

12   and Public Official 1.  (Gov't Exs. 370, 370A.)  During the call,

13   defendant solicited a favor for a friend, Individual 1, who needed a

14   tax issue resolved.  Public Official 1 was a high-level official of a

15   government agency able to secure a favorable outcome for Individual 1

16   on this tax issue.  Defendant told Public Official 1, "listen, a, a

17   friend of mine has some issues with the [government agency to which

18   Public Official 1 belonged]."  (Id.)  Defendant explained the issue,

19   and Public Official 1 responded, "We'll help him [Individual 1] out."

20   (Id.)  Defendant then gave Public Official 1 the contact information

21   for Individual 1.  Public Official 1 said, "we'll give him

22   [Individual 1] a call and figure out what it is."  (Id.)

23        Approximately one minute after defendant spoke with Public

24   Official 1, defendant called Individual 1 and said:[5] "I *took care* of

25   it for you...[h]e will call you today...His name is [name of Public

26   Official 1]."  (Gov't Exs. 371, 371B.)  Defendant stressed the need

27   _____

28        [5] Conversations with Individual 1 have been translated into
     English.  Italics represent portions of the recording in English.

for secrecy, however.  Defendant cautioned Individual 1: "Please do
not tell...anyone and keep it between us...Keep it to yourself."
(Id.)  The conversation continued:

> DEF:  **...Later he [Public Official 1] will tell me what he
> wants...help...most of the times I help his friends'
> campaigns and such.**

> IND1: I will help him if he wants.

> DEF:  No, no, don't tell him anything.  **No, do not talk
> about these things on the phone.**

> ...

> DEF:  **Also, when your work is complete, do not tell
> anything that this and that happened --**

> IND1: *Absolutely not, of course not.*

> DEF:  **-- No one, do not even trust your own shadow.**

(Id.)

On April 8, 2017, defendant followed up with Public Official 1
after he had learned that Individual 1's tax issue had not been
resolved.  (Gov't Exs. 387, 387A.)  Public Official 1 said that he
had "put [his] people on it" and assumed the issue had been resolved.
(Id.)  Public Official 1 vowed to resolve the issue with Individual 1
directly.  (Id.)  Defendant then called Individual 1 and told
Individual 1 to call Public Official 1.  (Gov't Exs. 388, 388B, 389,
389B.)  Defendant once again told Individual 1 to keep this
transaction confidential and not to trust anyone.  (Id.)

3.  Defendant Generally Donates to Public Officials
Intending to Influence Official Acts and Receive
Favorable Treatment in Return

Additional intercepted phone calls confirm defendant's
expectations when donating to public officials -- he expects official
acts and favorable treatment in return.  For instance, in one call,

10

defendant told Lobbyist 1 that he was going to need Public Official 4's "help soon in Washington."  (Gov't Exs. 390, 390A.)  To secure that "help," defendant said that he was going to "send him [Public Official 4] a check or two."  (Id.)  He then asked Lobbyist 1 to "strategize" this transaction for defendant and what defendant should "send" to Public Official 4.  (Id.)  In another call, defendant said that he refused to contribute to Public Official 5's reelection campaign, because the last time he donated, defendant did not get anything from Public Official 5 in return.  (Gov't Exs. 391, 391A.) Referring to Public Official 5, defendant said "fuck him."  (Id.) While these calls are certainly less egregious than the Shepos recordings and other disturbing wiretap calls, they do confirm defendant's pay-to-play intentions when providing financial benefits to public officials.

**III. ARGUMENT**

A mid-range Guidelines sentence of 108 months in prison, three years' supervised release, and a fine of $1,149,000, which defendant agreed to pay as part of his plea agreement, constitutes the appropriate sentence here.[6]  Such a sentence is sufficient, but not greater than necessary, to adequately reflect the seriousness of this yearslong, multimillion-dollar bribery scheme and defendant's aggravating relevant conduct.  A Guidelines custodial sentence is especially imperative to ward against unwarranted sentencing disparities, ensure general deterrence, and send a powerful message to the community that these kinds of egregious white-collar public

---

[6] The $1,149,000 fine, which defendant agreed to pay and Probation supports, represents all bribes paid and offered to Shepos: (1) $84,000 in cash ($12,000/year x 7 years) and (2) $1,065,000 for the purchase offer defendant placed on the home for Shepos.

corruption crimes are undeserving of unsupported leniency.

    **A.**   **<u>The Guidelines Calculation</u>: Defendant Has a Total Offense Level of 30 and Guidelines Range of 97 to 120 Months**

       Pursuant to the terms of the plea agreement and facts in this case, the government agrees with the United States Pretrial and Probation Office ("Probation") that the correct Guidelines calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 12 | [U.S.S.G. § 2C1.1(a)(2)] |
| Specific Offense Characteristics | | |
| -More Than One Bribe: | +2 | [U.S.S.G. § 2C1.1(b)(1)] |
| -Value of the Bribe: | +14 | [U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(H)] |
| -Bribe of High-Level Official: | +4 | [U.S.S.G. § 2C1.1(b)(3)] |
| Acceptance of Responsibility: | -2 | [U.S.S.G. § 3E1.1(a)][7] |
| **Total Offense Level:** | **30** | |

       Defendant has agreed to the everything in the aforementioned calculations, except the four-level enhancement for bribing a high-level official.  Defendant contends that Shepos was nothing more than a County employee who could "move paper." (Dkt. 261, ¶ 25.)  That

---

[7] Defendant seeks a third point for acceptance. (Dkt. 268, p. 6.)  U.S.S.G. § 3E1.1(b), however, requires a "motion of the government" for that third point.  The government does not move for additional acceptance because it substantially prepared for trial, including preparing trial exhibits, filing jury instructions, serving trial subpoenas, and filing and opposing pretrial motions.  Indeed, the government actively opposes it.  By pleading one week before trial, defendant did not "permit[] the government to avoid preparing for trial" or "allocate [its] resources effectively," as required by U.S.S.G. § 3E1.1(b).  <u>United States v. Velasco</u>, 849 F. App'x 645, 648 (9th Cir. 2021) (affirming district court's refusal to award third point where government declined to move for it after engaging in substantial trial preparation, follow-up investigation, and where defendant rejected plea offers).

gross mischaracterization belies the facts and defendant's own
admissions in his plea agreement.

As detailed in the government's filing at docket no. 264, a
high-level official is someone in a "position characterized by a
direct authority to make decisions for, or on behalf of, a government
department, agency, or other government entity, or by a substantial
influence over the decision-making process." U.S.S.G. § 2C1.1(b)(3),
App. Note 4(A). Defendant admitted in his factual basis that
"[b]ased on [Shepos's] level of seniority, [Shepos] had significant
autonomy to contractually bind the County." (Dkt. 240, p. 7.)
Shepos "had authority to negotiate contract terms on behalf of the
County, although final contract approval lay with the Board of
Supervisors." (Id.) He also "had authority to approve" lucrative
changes to existing contracts. (Id.) Shepos had authority to
"negotiate lease terms and draft lease agreements...or direct others
to do," as he did in this case. (Id.) Shepos was not a paper-
pusher. He was a high-level official with "significant autonomy" to
"bind" the County, which is precisely why defendant saw fit to bribe
him to the tune of over a million dollars.

In addition, in the related case of United States v. Enrique
Contreras, 19-CR-257-RGK (involving a contractor who too had bribed
Shepos), the Honorable R. Gary Klausner, United States District
Judge, agreed that Shepos was a high-level County official and
applied the four-level enhancement. Similarly, in United States v.
Mohammad Tirmazi, 19-CR-258-RGK (a case related to Contreras), Judge
Klausner also determined that another County official named Mohammad
Tirmazi was a high-level official where, as here, the official had
authority to make decisions affecting a County department.

13

1    Ultimately, Probation is correct that a four-level enhancement
2    is warranted, thereby bringing the Total Offense Level to 30 and a
3    Guidelines range of 97 to 120 months' imprisonment.[8]

4    **B.    The Nature, Circumstances, and Seriousness of the Offense**
5    **Warrant a Meaningful Guidelines Sentence of 108 Months**

6    In determining a sufficient sentence, courts must consider the
7    nature and circumstances of the offense.  18 U.S.C. § 3553(a)(1).
8    Courts must also impose sentences that reflect the seriousness of the
9    offense and provide just punishment.  18 U.S.C. § 3553(a)(2)(A).  For
10   these reasons, it is both appropriate and imperative for the Court to
11   impose the government's recommended sentence of 108 months in prison.

12   For nearly seven years, defendant bribed a high-level public
13   official (Shepos) with monthly cash payments in exchange for his help
14   securing lucrative County leases and other benefits.  Then, in 2016,
15   defendant upped the ante.  Seeing an opportunity to leverage a huge
16   $45 million County lease (the DPSS Lease) into a **$500 million**
17   **windfall,** defendant offered to buy Shepos a million-dollar home in
18   Northern California provided Shepos could secretly deliver the lease.
19   The DPSS Lease would commit the County to rent office space in the
20   Hawthorne Mall with a total rental income to defendant of at least
21   $45 million.  But $45 million was not the financial endgame.  With a
22   long-term, reliable tenant like the County anchoring the mall,
23   defendant believed he could get bank loans to redevelop the property,
24   attract other tenants, and ultimately increase the mall's assessed

25
26

27          [8] Because the high-end of defendant's Guidelines range (121
     months' imprisonment) exceeds the statutory maximum sentence for his
28   crime of conviction (120 months), his Guidelines range is 97 to 120
     months' imprisonment.  (Dkt. 261, ¶ 117.)
                                  14

1    value from $17 million to $500 million.  The only problem for

2    defendant?  The FBI was listening.

3        In late 2016, Shepos had begun cooperating with the FBI.  In

4    recorded meetings, defendant paid Shepos his monthly cash bribes and

5    repeatedly offered to buy Shepos a million-dollar home in exchange

6    for the $45 million lease.  He even promised Shepos a "better" bribe

7    if Shepos could deliver another lucrative County lease for a property

8    defendant owned in Pomona.  The recordings made clear that, contrary

9    to what defendant told Probation, defendant was not driven by

10    sympathy for his "friend" Shepos but, rather, profit for himself.

11        Indeed, but for the FBI knocking on defendant's door and

12    informing him that they were aware of his bribes to Shepos, defendant

13    would have closed escrow and purchased the Northern California home

14    for Shepos.  He would have secured a massive County lease for the

15    Hawthorne Mall through fraud and bribery.  Defendant also would have

16    continued his bribery scheme with Shepos, moving forward on that even

17    "better" bribe to entice Shepos to deliver another lucrative County

18    lease for a property defendant owned in Pomona.  The potential

19    catastrophic damage to the County's interests here was only halted

20    because the FBI alerted defendant to its investigation, not because

21    defendant he had a change of heart or a modicum of self-reflection.

22    (Defendant withdrew his $1,065,000 offer on the Northern California

23    property mere hours after FBI agents approached him.)

24        In fact, it is worth noting that when the FBI interviewed

25    defendant, he lied and minimized.  Five years later, little has

26    changed.  In his Probation interview, defendant has continued that

27    self-serving trend as he tried to convince Probation that Shepos was

28    nothing more than a guy who "move[d] paper" and that he was a victim

of his friendship with Shepos.  (Dkt. 261, ¶¶ 24-25.)  Defendant
tried to convince Probation that his sympathy for Shepos was the
"driving force" behind this case.  No.  Profit was.  Years of County
leases and inside information, a $45 million-dollar County lease, and
hopes for a $500 million windfall through the sale of the Hawthorne
Mall -- all that was the driving force motivating defendant's
corruption, not friendship.  While these two men certainly had a
personal relationship after seven years of a mutually beneficial
corrupt partnership, defendant did not pay Shepos monthly in
restaurants, cars, or men's restrooms because they were friends.  He
secretly paid Shepos to gain an unjust advantage and enrich himself.

Contrary to what he would like Probation and this Court to
believe, defendant's bribery scheme with Shepos was not an aberrant
poor choice driven by a misguided friendship.  This conclusion is
evident from phone calls intercepted pursuant to two court-authorized
wiretaps in which defendant talked about trading financial support
for official acts and political access on matters wholly unrelated to
Shepos.  As noted, defendant worked to conceal these dealings, often
telling people not to discuss matters on the phone or to disguise the
true purpose of an otherwise illegal campaign donation so that it
could pass the "smell test."  Using financial leverage to secure
official action and unfair advantages was how defendant did business.

To be clear, defendant's corruption was not a victimless crime.
Public corruption related to lucrative real estate projects harms the
community in at least three long-lasting ways.  First, it shatters
the trust the community has in its public servants.  "Public
corruption demoralizes and unfairly stigmatizes the dedicated work of
honest public servants.  It undermines the essential confidence in

16

our democracy and must be deterred if our country and district is
ever to achieve the point where the rule of law applies to all -- not
only to the average citizen, but to all elected and appointed
officials." United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D.
Ill. 2006), affirmed, 477 F.3d 517 (7th Cir. 2006).  Second, it
deters legitimate businesses from seeking to participate in the local
economy for fear that they are entering a tainted marketplace where
decisions are made not on merit but illicit bases.  Third, and
relatedly, it incentivizes further corruption by inviting other
corrupt businesses who become aware they can get a lucrative return
if they are willing to pay to play.  All of this directly harms and
disrupts the local economy costing it, not only the public trust, but
also jobs, businesses, and meaningful real estate projects from
businesses that wish to compete on a level playing field.

Ultimately, for all of these reasons, defendant's egregious
seven-year scheme with Shepos, the magnitude of the Shepos bribes
($1,149,000), and defendant's other aggravating conduct observed on
the wiretaps (unrelated to Shepos) collectively justify a mid-range
Guidelines sentence of 108 months.

**C.    Defendant's History and Characteristics Are Aggravating,
Not Mitigating, and in No Way Justify a Downward Variance**

The Court must also consider the history and characteristics of
defendant.  18 U.S.C. § 3553(a)(1).  This factor too weighs in favor
of a mid-range Guidelines sentence of 108 months.

Although defendant came from modest beginnings, he achieved the
American Dream.  He built a wildly profitable family business, became
a powerful entrepreneur in California, and has close relationships
with his children and family members, many of whom have submitted

17

1  letters on his behalf.  His crimes were borne, not of desperation or
2  financial hardship, but of unadulterated greed.
3      The fact that relatives and business partners have submitted
4  letters on his behalf should be considered -- but with appropriate
5  context.  People who are nice to their family and friends are not
6  dissimilar from most criminals.  Defendant does not have to be
7  unfeeling to be deserving of a Guidelines sentence.  The fact that
8  defendant is kind to individuals close to him (either through a
9  familial connection or mutually-beneficial business relationship) is
10  not a significantly mitigating factor warranting a variance -- and
11  certainly not the 37-month variance proposed by Probation.  See,
12  e.g., United States v. Vrdolyak, 593 F.3d 676, 682 (7th Cir. 2010)
13  (vacating district court's probationary sentence where it erred by
14  giving "enormous weight to letters urging leniency for the defendant,
15  while virtually ignoring the evidence that tugged the other way");
16  United States v. Peppel, 707 F.3d 627, 641 (6th Cir. 2013) (vacating
17  a seven-day sentence for securities fraud defendant where he
18  submitted over 100 letters of support and observing that defendant's
19  "status in the community and chosen profession cannot alone be the
20  basis for...a conclusion" that he enjoyed unusual support from family
21  and business associates).
22      Contrary to his claims (dkt. 268, p. 41), defendant's history
23  and characteristics are in no way similar to the extraordinary set of
24  facts encountered by the sentencing court in Gall v. United States,
25  552 U.S. 38 (2007).  There, Gall joined a conspiracy to distribute
26  ecstasy in college but, prior to any investigation or charges,
27  voluntarily withdrew from the conspiracy, stopped using drugs, and
28  turned his life around, graduating from college and establishing a

18

career.  Gall, 552 U.S. at 41-45.  After moving to another state and starting a productive, law-abiding life there, Gall was eventually interviewed by law enforcement.  Id. at 42.  He told the truth and admitted his conduct.  Id.  Law enforcement then took no further action.  When later indicted (three and a half years after withdrawing from the conspiracy), he voluntarily surrendered to authorities, pled guilty immediately, and cooperated (although his information did not ultimately turn out to be useful in any ongoing investigation).  Id.  In every way, defendant is the anti-Gall.[9]  Gall is someone who truly accepted responsibility.  He turned his life around years before he knew of any federal investigation or charges, which speaks to a genuine acceptance of responsibility and unusually low risk of recidivism.  He did not lie to federal agents, as defendant did.  He never minimized, as defendant continues to do to this day.  He had a drug problem, which partially motivated his own narcotics activity.  Defendant, on the other hand, had a stable life, successful career, and immense financial security when he chose, every single month for seven years, to bribe Shepos.  Greed, not financial desperation or a drug addiction, drove defendant.  And it is what will continue to drive defendant as he presses forward with his real estate empire, unless checked by this Court.

Further, while reasonable minds can weigh the various Section 3353(a) factors differently, the law requires they not be weighed to unjustly favor certain classes of defendants (e.g., those in positions of power and prestige who are better able to compile an

_____

[9] Further highlighting the gulf between defendant and Gall is the fact that Gall's advisory Guidelines range was 30 to 37 months' imprisonment, 552 U.S. at 43, not 97 to 120 months' imprisonment (dkt. 261, ¶ 117).

army of support letters) and disfavor others; furthermore, no factors should be omitted from the balancing.  See <u>United States v. Bragg</u>, 582 F.3d 965, 969 (9th Cir. 2009) ("The very broad discretion of district judges in sentencing post-<u>Booker</u> does not extend to ignoring sentencing factors mandated by statute."); <u>see also</u> <u>Gall</u>, 552 U.S. at 49-50.  Disparate treatment favoring certain classes of defendants is improper.  "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."  <u>United States v. Prosperi</u>, 686 F.3d 32, 47 (1st Cir. 2012).  Collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends -- would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.  And '[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.'" <u>United States v. Bistline</u>, 665 F.3d 758, 765-66 (6th Cir. 2012) (citation omitted).

**Ultimately, individuals, like defendant, who have earned significant levels of professional success and thus are able "to make a decent living without resorting to crime are <u>more rather than less culpable</u> than their desperately poor and deprived brethren in crime."** <u>United States v. Stefonek</u>, 179 F.3d 1030, 1038 (7th Cir. 1999) (emphasis added); <u>see also</u> <u>United States v. Kuhlman</u>, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").  For this reason, defendant's history and characteristics merit a Guidelines sentence, not a lenient downward variance.

20

D.    **General Deterrence Is Paramount in Public Corruption Cases
to Promote Respect for the Law and Deter Future Crimes**

Any sentence must promote respect for the law, afford adequate
deterrence, and protect the public from future crimes.  18 U.S.C.
§ 3553(a)(2).  To that end, general deterrence is particularly
important in public corruption cases.  **The government cannot police
all corrupt actors, but through Guidelines sentences, this Court can
send a powerful deterrent message for corrupt actors to police
themselves.**

Courts have emphasized that sentences fashioned to ensure
general deterrence are an especially effective tool in corruption
cases, as white-collar criminals often premeditate their crimes and
engage in a cost-benefit analysis.  See, e.g., United States v.
Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and
fraud-based crimes are more rational, cool, and calculated than
sudden crimes of passion or opportunity, these crimes are prime
candidate[s] for general deterrence.  Defendants in white collar
crimes often calculate the financial gain and risk of loss, and white
collar crime therefore can be affected and reduced with serious
punishment.") (internal quotations and citation omitted).  "General
deterrence comes from a probability of conviction and significant
consequences.  If either is eliminated or minimized, the deterrent
effect is proportionately minimized." United States v. Morgan, 635
F. App'x 423, 450 (10th Cir. 2015).  By their nature, white-collar
crimes are often difficult to detect, thereby making enhanced general
deterrence even more necessary.  See United States v. Brown, 880 F.3d
399, 405 (7th Cir. 2018) (district court did not err in relying on
the notion that white-collar criminals were prime candidates for

21

general deterrence; district court was entitled to conclude that where there was a lower likelihood of getting caught, a serious penalty was necessary to ensure deterrence).  In a case affirmed by the Seventh Circuit, one district court poignantly noted:

> We need not resign ourselves to the fact that corruption exists in government.  **Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable.**  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all...

Spano, 411 F. Supp. 2d at 940 (emphasis added).

Congress too has deemed deterrence a crucial factor in sentencing decisions for economic and public corruption crimes such as this one.  See S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("[A] purpose of sentencing is to deter others from committing the offense.  This is particularly important in the area of white collar crime.  Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing importance of "the deterrence of white-collar crime (of central concern to Congress)").

Defendant's conduct here falls squarely within the type of criminality Congress and courts target for general deterrence.  Defendant took calculated risks for nearly seven years, always

1  banking on the fact that his crimes were difficult to detect and

2  unlikely to be uncovered.  Contrary to Probation's perplexing and

3  hindsight-based assumption, defendant's scheme was not "relatively

4  simple and easily discoverable."  (Dkt. 260, p. 3.)  Nothing about a

5  multi-year corruption investigation -- requiring the government to

6  learn of purported corruption, build a case on a cooperator, flip

7  that cooperator, covertly record a target, and obtain not one, but

8  two wiretap orders from a federal district court judge in a white-

9  collar matter -- in any way suggests that this scheme was "simple"

10 and "easily discoverable."  That perception is divorced from the

11 realities of federal white-collar investigation and unfairly credits

12 defendant for appearing to operate in a less sophisticated, overt

13 way.  The facts here patently reject that perception.  Indeed,

14 defendant took great pains to keep the Shepos scheme from coming to

15 light -- always paying Shepos in cash, insisting that the cash

16 payments never be made in the open (which is why he paid Shepos in

17 places like men's restrooms), ensuring that he and Shepos never

18 talked openly in email or text message, insisting that the million-

19 dollar real estate options not be emailed but instead printed and

20 hand-delivered to Shepos, and attempting to have an unindicted

21 coconspirator use a shell company to purchase the Santa Rosa property

22 so that neither defendant nor Shepos would be linked to the purchase.

23 Because the white-collar crimes by defendant (and others who operate

24 like him) are exceedingly difficult to detect, any sentence must

25 ensure both specific and general deterrence.  A Guidelines sentence

26 of 108 months accomplishes just that.

27

28

E.    **A Below-Guidelines Sentence Will Create Unwarranted
Sentencing Disparities, Perpetuating Notions of a
Two-Tier System of Justice for White-Collar Defendants**

Although now advisory, the Guidelines exist for a reason.  They protect against unwarranted sentencing disparities.  When courts deviate from the Guidelines in public corruption cases without sufficient justification, sentencing can create (or at least, feed the perception of) a two-tier system of justice -- a more flexible and lenient tier for well-known or well-heeled white-collar defendants, and a more rigid, severe, and Guidelines-oriented tier for "other" criminals.  See United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) (Guidelines created "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes") (internal citations omitted).  That dichotomy is inconsistent with the Constitution, fundamental fairness, and the statutory goals of sentencing, and it has been repeatedly repudiated by the courts.  See United States v. Treadwell, 593 F.3d 990, 1012-13 (9th Cir. 2010) (overruled on other grounds) (rejecting that a defendant of means should be afforded a lower prison sentence to enable him to pay restitution; noting the need to deter white-collar crime and minimize discrepancies between white-collar and blue-collar sentences); Stefonek, 179 F.3d at 1038 (white-collar criminals must "not to be treated more leniently than members of the 'criminal class'").

**Tellingly, Probation provides little justifications for its recommendation of 60 months -- a striking 37-month downward variance that represents an almost 40% discount from the low-end of the Guidelines range (97 months).  Indeed, such a recommendation is**

**inconsistent with other corruption sentences for bribery schemes of a similar scope and magnitude.[10]**  At best, Probation attempts to justify its recommendation by suggesting that defendant has done some self-reflection, realizing that his conduct was borne of sympathy for Shepos.  (Dkt. 260, p. 4.)  But defendant's statements typify self-serving revisionist history and show that, to this day, he fails to appreciate the breadth and scope of his own culpability.  As such, his statements to Probation are truly aggravating, not mitigating.

Defendant's minimization throughout his Probation interview, at times coming close to breaching his plea agreement due to their apparent inconsistency with his sworn factual basis, is staggering. He seeks sympathy, portraying himself as a victim and placing the blame for seven years of bribes (or "inducements," as he calls them in yet another effort to minimize his own conduct, dkt. nos. 268, 268-2) squarely on Shepos.  Furthermore, despite admitting in his plea agreement that Shepos possessed "significant autonomy to contractually bind the County" (dkt. 240, p. 7), he attempts to

---

[10] See, e.g., United States v. Rezko, no. 05-CR-00691-AJS-4 (N.D. Ill. 2011) (businessman and political fundraiser sentenced to 126 months for bribery and fraud; court focused on need for general deterrence at sentencing, saying: "Enough is enough.  Corruption in Illinois has to stop."); United States v. Mangano, no. 16-CR-00540-JMA (E.D.N.Y. 2022) (Nassau County Executive sentenced to 12 years in bribery case for accepting five vacations, hardwood flooring, custom-made office chair, massage chair, a watch, and over $450,000 for his wife's no-show job); United States v. Esquenazi, no. 09-CR-21010-JEM (S.D. Fla. 2011) (executive sentenced to 15 years for scheme involving $890,000 in bribes paid to officials at a Haitian state-owned telecommunications company); United States v. Toy, no. 14-CR-00023-RBS (E.D. Va. 2014) (naval manager sentenced to 96 months for a five-year bribery scheme in which he accepted more than $265,000 in cash); United States v. Jument, no. 09-CR-00397-HEH (E.D. Va. 2010) (businessman sentenced to 87 months for offering $200,000 in bribes to Panamanian officials for government contracts); United States v. Nuru, no. 21-CR-490-WHO (N.D. Cal. 2022) (San Francisco Public Works director sentenced to 84 months for a 12-year bribery scheme).

downplay Shepos's significance, writing him off as someone who merely
"move[d] paper" with little control over the lucrative contracts
defendant sought (dkt. 261, ¶ 24). He even attempts to downplay the
$1,149,000 in bribes by claiming that he merely wanted to help his
friend -- a so-called "friend" he saw once a month to pay cash bribes
in restaurants, cars, and men's restrooms. He shifts blame by saying
Shepos was "perplexing and erratic," none of which is borne out by
the four months of recordings in this case. (Dkt. 261, ¶ 24.) What
is borne out in the recordings is a defendant driven by greed and
eager to capitalize on relationships for personal gain. Indeed, even
when Shepos laughed, shrugged off defendant's attempts to bribe him
with the million-dollar home, and flatly told defendant "don't do
anything," defendant continued to press. (Gov't Exs. 125, 125A.)
Defendant upped the ante, trying to convince Shepos that if he
secured a County lease for defendant's Pomona property too (in
addition to the $45 million lease for the Hawthorne Mall), the bribe
would only get "better." (Id.)

    Most of all, what defendant wholly sidesteps in his interview
with Probation is the series of other wiretap calls that, separate
and apart from Shepos, exemplify his pay-to-play intentions and
corrupt relationships with public officials. To be clear, in just
two months of lawfully surveilling defendant's phone calls, the
government did not randomly hit the jackpot. The government obtained
a representative two-month sampling of defendant's 40-year career --
and that miniscule sample size is replete with examples of
defendant's corrupt dealings separate and apart from Shepos.

    Ultimately, Probation's recommended downward variance of 37
months is not only unsupported by the facts here, it is rejected by

them.  It is also rejected by the case law.  Almost everything about defendant's conduct and circumstances is <u>aggravating</u>.  Little is mitigating.  And Probation offers almost nothing -- factually or legally -- to justify its massive variance, certainly nothing warranting a 40% variance from a Guidelines range carefully calculated to ward against two-tiered justice in cases just like defendant's.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 108 months' imprisonment, three years' supervised release, and a fine of $1,149,000, which defendant agreed to pay as part of his plea agreement.