

THE ALEPH INSTITUTE

NATIONAL HEADQUARTERS
9540 Collins Avenue, Surfside, FL 33154
Phone: (305) 864-5553

WEST COAST BRANCH
4221 Wilshire Blvd, #170-6
Los Angeles, CA 90010
Phone: (424) 210-3685
www.aleph-institute.org

**Rabbi Yossi Bryski**
ybryski@aleph-institute.org

**Chairperson / Founder**

Rabbi Sholom D. Lipskar

**President**

Lloyd S. Rubin

**Board of Directors**

Robert Danial

Boruch Duchman

Joy Fishman

Stephen Fiske

Russel Galbut

Reuven Herssein

Daniel M. Holtz

Alberto Kamhazi

Sonny Kahn

Rabbi Aaron Lipskar

Rabbi Sholom D. Lipskar

Morris Mendal

Lloyd S. Rubin

Eric Stein

Sylvia Urlich

**Executive Director**

Rabbi Aaron Lipskar

**Director of Operations**

Moshe N. Barouk

**Director of Outreach Programs**

Rabbi Menachem M. Katz

**Director of Military Programs**

Rabbi Sanford L. Dresin

**Director of Advocacy**

Rabbi Zvi Boyarsky

**Director of Outreach Programs**

Rabbi Shua Brook

**Chief Financial Officer**

Yosie Lipskar

December 8, 2022

The Honorable George H. Wu
United States District Judge
Central District of California
United States Courthouse
350 West First Street
Los Angeles, California 90012

Re:     ***United States v. Arman Gabaee***
        Case No. 2:18-CR-00331-1

Dear Judge Wu:

I write on behalf of the Aleph Institute ("Aleph"), with respect and deference to the Court, regarding the sentencing of Mr. Arman Gabaee. We wish to share our sentencing proposal that, we humbly submit, would further the goals of sentencing in achieving optimal results for Arman and for society. We would never take this opportunity for granted, and we are grateful for your consideration of this submission.

We genuinely hope and pray that we may be of service to the Court by providing the following meaningful alternative to incarceration for your consideration. We recommend that the Court consider a sentence for Arman consisting of a plan of community service and spiritual counseling in lieu of incarceration. We believe that incarceration would not provide any meaningful benefit to Arman or to society. In contrast, our community service plan would be rehabilitative to Arman and beneficial to the community at large. We are hopeful that you will find that our presentation effectively addresses the compelling facts and circumstances specific to this case, and we are available to provide any additional input that may assist you in your sentencing decision.



THE ALEPH INSTITUTE

## I.    **THE ALEPH INSTITUTE**.

The Aleph Institute ("Aleph") was formed in 1981 at the direction of The Lubavitcher Rebbe, Rabbi Menachem M. Schneerson, *may his merit shield us,* to provide support and rehabilitation to individuals enmeshed in the criminal justice and penal systems.[1] Aleph became a reality during a meeting between Rabbi Sholom D. Lipskar and the Honorable late Jack Weinstein of the U.S. District Court for the Eastern District of New York. Judge Weinstein wrote the following about Aleph: ***"[T]he Aleph Institute, and [its] associates understand and force us to face the fact that each person deserves to be treated with respect as an individual personality and not as . . . a faceless number***.*"*[2] Judge Weinstein continued, "[Aleph's] assistance to defendants and their families provide standards of compassion and aid worthy of emulation . . . As a result of its good work, Aleph is widely known and respected by penal and judicial authorities."

Aleph's work in the realm of criminal sentencing has been devoted to the development of effective alternative sentencing options.[3] Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by alternative means, without compromising the need to promote criminal justice goals such as rehabilitation, retribution, deterrence, and incapacitation. We work closely with courts, federal and state lawmakers, law professors, and penal experts towards our common goal of achieving outcomes that promote justice, lessen the burden on shared penal resources, reduce recidivism, and benefit offenders, together with their families and communities. We take seriously our mission, which former FBI director and retired U.S. District Judge, the Hon. Louis Freeh, eloquently summarized as "championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes."[4] We are further guided by our ethical teachings which emphasize that every individual – no matter his shortcomings – naturally has a positive purpose to fulfill in the world.

---

[1] www.aleph-institute.org; *see, also*, Appendix A: About Aleph.
[2] Hon. Jack B. Weinstein, Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines, 1 JUDGE J. 16, 28 (1989).
[3] For more information about Aleph's efforts in alternative sentencing, *see* Appendix B: Incarceration vs. Alternative Sentencing.
[4] *See* Appendix C: Comments on Aleph.



THE ALEPH INSTITUTE

Since its formation, Aleph has submitted alternative sentencing recommendations in many criminal cases (federal and state) throughout the United States.[5] We advocate for alternative sentences for individuals in whom we detect a deep sincerity and a genuine willingness to make positive changes in their lives. Further, we only advocate on behalf of individuals who have passed our rigorous screening process, and we do not advocate for any individual unless we are confident that they do not pose a future threat to society. ***We provide our services on a pro bono basis, motivated only by our sincere belief in the work that we do.***

We readily acknowledge that prison terms are often necessary as appropriate punishment for serious offenses and/or to protect the public from violent, predatory, or unrepentant offenders. Still, courts have observed that ***"[i]ncapacitory sentences are usually unnecessary to increase public safety, or prevent recidivism; they place a tremendous financial burden on society through excessive incarceration."***[6]  In our experience, lengthy periods of incarceration inhibit defendants from fulfilling their potential, and devastate the family and community left behind, breeding bitterness, anger, insensitivity, and eventual recidivism. Too many defendants "lose their claim to a future" when "lengthy prison terms" are substituted for "reasonable, innovative, and promising alternatives to incarceration."[7] We find that our sentencing philosophy is given excellent expression in these words from William Fitzpatrick, the former President of the National District Attorneys Association, who suggests that ***"that we use prison for those we are afraid of, not those whom we are mad at based on their behavior."***[8]

---

[5] For several examples of Aleph's Alternative Sentencing cases, *see* <u>Appendix D</u>: Selected Successful Aleph Alternative Sentencing Cases.

[6] *United States v. Rivera*, 281 F. Supp. 3d 269, 271 (E.D.N.Y. 2017).

[7] *United States v. Dossie*, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation omitted).

[8] April 26, 2016, letter to Senators Mitch McConnell and Harry Reid.



THE ALEPH INSTITUTE

## II.    ARMAN GABAEE.

### A.    Arman's Childhood.

Arman Gabaee was born in 1961 in Iran. His father, Norman, was extremely hard-working and family-oriented. Norman's life in Iran was difficult – he grew up in Kashan (Iran) without running water or electricity. At the age of 12, Arman's father moved to Tehran so he could work in the market during the day and attend school in the evenings. Arman describes his father as "wise, he loves to read, even though he never went to college, he's self-educated . . . ." Arman's mother, Mariam, came from Tehran. Arman describes his mother as "very caring . . . very selfless, she's extremely loving and extremely sensitive . . . ..." Arman had two older brothers – Cameron (who passed away from cancer in 2003), and Marc (who is 65 years-old).

Arman describes his childhood in Iran as loving, though marked with the antisemitism that he and his family experienced. His father would not let Arman attend a Jewish school because he was afraid of the possibility of terrorist attacks. Arman was ridiculed and even threatened in school. He had a short attention span, which made studying more difficult. He also had health problems and was often sick, suffering from significant sinus problems throughout his life. In Iran, Arman did poorly in school.

In 1975, Arman came with his parents to visit his siblings, who were already living in the United States. Arman's parents returned to Iran, and he stayed with his brothers, and enrolled at Troy High School in Fullerton, California. Arman describes this period as "a struggle, I cried a lot, I missed my mother, she was very loving." Arman continued to struggle at school as he took ESL classes to learn English. He was "drifting along, not happy." In 1978, during one of his parents' visits to the United States, the Iranian revolution began, and they did not return to Iran. The family lost their business and almost everything they had in the revolution.

### B.    Young Adulthood and Real Estate Business.

Through his father's contacts, Arman began working at a tire dealership in South-Central Los Angeles. He did whatever the owner of the business asked him to do, as Arman describes, "it was physical work, and I'd never done that kind of work, like moving tires." One day, the owner of the store asked Arman to start delivering tires to customers. He was delivering tires all over Los Angeles, and in this way, he

4



learned about all of the neighborhoods. This knowledge became useful, as Arman and his brother began purchasing real estate in less affluent neighborhoods. They would purchase lots for development, and Arman's role became "supervising construction jobs," and then leasing out the properties.

The family real estate business began to grow and prosper. Arman and Marc's skills complemented each other – Arman provided the vision, and much of the salesmanship, whereas Marc contributed management skills and stability. This relationship continued smoothly until some point in 2015, when tensions between the two brothers caused them to consider separating and dividing the properties between them. However, this planned separation did not go smoothly. This period created a great deal of stress and anxiety for Arman as he faced the prospect of running his business on his own. Eventually, both brothers realized that they were better off working with each other, and that much of their success could be attributed to the symbiotic nature of their relationship and contributions to the company. They both decided to stay with the company and work together.

## C.   <u>Arman's Enormous Contributions to his Community</u>.

Arman's contributions to his family and his community – of his time, energy, caring and love, as well as his resources – are remarkable. Most of these efforts have been donated anonymously, without any recognition or fanfare. When Arman was a young man, he witnessed his father help to rescue countless children as they fled from Iran to Pakistan. His father undertook these good deeds quietly, not for purposes of self-aggrandizement. As a child, Arman remembers that his parents regularly hosted engagement parties, bar mitzvas and weddings. They never turned any community-member down. Similarly, Arman has led his life guided by the same principles.

Arman has assisted family members by providing weddings for their children. He donates food each Thanksgiving to communities in South Central Los Angeles. After his brother passed away in 2003, Arman took it upon himself to make sure that his sister-in-law and her three children were provided for. Arman has taken his nephew under his wing – making sure that he received much-needed psychotherapy after experiencing sexual abuse as a young child. Arman provided needed friendship and mentorship to a family friend when he was severely depressed. He has donated equipment to paramedics, and frequently pays medical expenses for others.



THE ALEPH INSTITUTE

Perhaps most remarkable is the tremendous amount of time and resources Arman has devoted to the rehabilitation of the Union Rescue Mission on Skid Row in downtown Los Angeles. Established in 1891, the Union Rescue Mission is the oldest rescue mission in Los Angeles, and one of the largest in the United States.[9] The Union Rescue Mission is a nonprofit organization that helps men, women and children experiencing homelessness to "get off the streets and find their way home."

The Union Rescue Mission was badly in need of significant renovation and repair (including major plumbing work). Reverend Any Bales, the President and CEO of the Union Rescue Mission, writes "in order to achieve the proper repair work, we asked for bids and the best bid we received was $6,000,000, which was way outside our budget." Arman learned of the mission's plight, and asked how he could help.

Through his real estate knowledge and contacts, Arman knew he could significantly reduce the costs involved. He offered to supervise and finance the entire protect himself, donating all of his time and all of the materials required. The project is now well underway, and once completed, it will greatly increase the mission's capacity to serve homeless people in the community. Reverend Bales writes, "without [Arman's] help we would not have been able to do this project. Remarkably, Arman is not charging us for any of the work, labor or materials that will be ongoing for the next 18 months." Using his specialized knowledge and skill in the construction and rehabilitation of real estate, Arman has already made a significant contribution to the Union Rescue Mission's efforts to help people experiencing homelessness – and these contributions will only increase if he were to remain in the community.

In addition to the Union Rescue Mission, Arman has devoted his time and resources to several other community organizations, including Hadassah, Magbit Foundation, Hope Foundation, City of Hope, Persian American Women's Conference, Greater Jewish Federation, Sinai Akiba Academy, Sinai Temple, Milken School, Etta Organization, Looking Beyond, and Cal State Northridge Scholarship Fund through ICSC.[10]

---

[9] www.urm.org.
[10] *See* Presentence Investigation Report, Paragraph 72.



THE ALEPH INSTITUTE

### III.    ALTERNATIVE SENTENCING.

#### A.    Arman is a Strong Candidate for Alternative Sentencing.

Through our work with Arman, as well as with his family and friends, we have had an opportunity to understand him as a complete person, separate and apart from his criminal conduct, and we have seen all the good of which he is capable. We are aware of the nature and circumstances of his offense, and we acknowledge that his actions were inexcusable. We have counseled him as he faced all the challenges resulting from his conduct and we have supported him as he engaged in efforts to learn and grow from his experiences. We have consulted with Arman's attorney and his family in an effort to understand how he may best move forward and repay his debt to society.

Arman has already begun to use the incredibly painful experience initiated by his criminal conduct to better himself, as well as to help others. We believe that he is already having a positive impact on others, but the impact on his own psyche has been even greater.  He has begun to internalize why his conduct was so wrong and how he can use the insights he has gained to help others and to become a better person. Arman feels enormous and constant remorse for his actions, as he writes, "it is hard to find the words, Your Honor, to describe how ashamed I am for having offered and paid inducements to Thomas Shepos . . .."

In our interactions with Arman, we see that he is learning and listening, and we believe that he, his family, and his community, would be better served by a sentence consisting of a program of community service in lieu of incarceration. Allowing Arman to remain in the community would allow him to continue the selfless work he has already begun, like the Union Rescue Mission project. He has already made substantial efforts and progress towards the completion of the Union Rescue Mission project, and his continued involvement with those efforts is indispensable to its success. In addition, numerous members of Arman's family members count on him not just financially, but also for moral and emotional support. Arman's company currently has 18 projects in various stages of development, and his absence from the company would jeopardize these projects, as well as the overall economic health of the communities where these projects are located. Finally, in the event Arman were incarcerated, it is quite possible that his absence from his company could negatively impact the employment of large numbers of individuals who work at the company and who count on their jobs for their survival.



**THE ALEPH INSTITUTE**

**B.    Alternative Sentencing Proposal.**

Our sentencing proposal consists of continued community service, and spiritual counseling and mentoring in lieu of incarceration. Aleph can closely monitor Arman's compliance with the proposed program of community service, which would be rehabilitative. Aleph, in turn, would provide regular and detailed progress reports to U.S. Probation (or the Court) as needed.

*1.    Community Service.*

Arman's work in renovating the Union Rescue Mission requires a significant commitment of his time as well as resources. He will continue to provide guidance and supervision to the ongoing project to ensure it reaches completion in a timely manner.

*2.    Spiritual Guidance and Community Support.*

Rabbi Zvi Boyarsky has been a mentor and a dedicated Rabbi in the Los Angeles community for many years, catering to the spiritual and emotional needs of thousands of people, and his care and devotion to his community is remarkable. Rabbi Boyarsky has already met with Arman. He has committed to continuing to guide Arman, and will be a strong support system for him.

**C.    Application of Section 3553(a) Sentencing Factors.**

*1.    Retribution.*

Under our proposal, Arman will continue to have requirements placed on him in the form of his continued community service obligations. Also, while not a formal element of our proposal, it cannot be denied that Arman has already experienced tremendous shame and humiliation as a result of his arrest and conviction. The Bible, Maimonides, and Jewish Law all emphasize the power that shame has to transform a person's actions, and as such we believe that shame suffered by an individual should not be undervalued or unappreciated.

8



THE ALEPH INSTITUTE

    2.    *Deterrence*.

Whereas a prison sentence often fails to provide adequate deterrence, shame succeeds. Shame is a powerful reason that non-custodial sentences can be effective in deterring criminal conduct and Arman's shame is acute.

    3.    *Incapacitation*.

Arman has never been in trouble with the law before, and the behavior that gave rise to his conviction was completely out of character for him. He understands the damage he caused by his mistakes. Therefore, it is highly unlikely that Arman will reoffend.

    4.    *Rehabilitation*.

Our proposal is specifically tailored to address the rehabilitative goal of sentencing. As many scholars, the Supreme Court, and the Rabbis at Aleph have all observed, prison is often not conducive to "promoting correction and rehabilitation."[11] This is because rehabilitation is a "forward-looking" concept, promoting resocialization by emphasizing "personal reform over punishment" and "illuminat[ing] the criminal's inner struggle,"[12] and as such only works when combined with an intense personal commitment to change. Perhaps understandably, though imprisonment may satisfy a thirst for retribution, the prison environment rarely inspires this commitment in the incarcerated individual. As Judge Richard Lowell Nygard once observed, "people – offenders included – change because they see something in themselves they do not like, and they reach down inside themselves and change it. Most criminal offenders who change for the better do so in spite of prison not because of it."[13]

Whereas prison may not promote rehabilitation, community-based programs like Aleph's proposal are often effective at restoring an individual's commitment to ethical behavior. The same characteristics that have made Arman such a source of strength for his own family and community will ensure that his efforts have a strong

---

[11] *Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011)*; see also* Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 460 (2016).

[12] Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 458-60 (2016).

[13] Richard Lowell Nygaard, *Crime, Pain, and Punishment: A Skeptic's View*, 102 Dick. L. Rev. 355, 362-63 (1998).



THE ALEPH INSTITUTE

positive impact for those with whom he interacts under the terms of this proposal. In addition, Arman's program of rehabilitation includes spiritual guidance and community support and reinforcement. We believe that Arman will be able to rehabilitate himself through these efforts, and that, in the process, he will push others to reach their full potential.

## IV.    <u>CONCLUSION.</u>

Arman is painfully aware that his actions were terribly wrong, and he longs to make amends. He has learned a tremendous amount about himself since his conduct, and he accepts responsibility for his actions. He is an asset to his family, his friends, and his community, and there are so many people who would suffer in his absence.

With the utmost respect and admiration for Your Honor's wise and compassionate decisions, I hope and pray that this submission will receive the consideration that will produce satisfactory results for society and for Arman.

With gratitude and prayerful wishes for all good.


Respectfully submitted,

/s/ Yossi Bryski

Rabbi Yossi Bryski
Director of Alternative Sentencing
The Aleph Institute

10



# APPENDIX A

# ABOUT ALEPH

*No One Alone. No One Forgotten.*

## INTRODUCTION

Aleph was founded in 1981 in the chambers of the Hon. Jack Weinstein, then-Senior District Judge of the United States District Court for the Eastern District of New York, at the behest of the Lubavitcher Rebbe. Aleph provides direct supportive services for criminal defendants, incarcerated persons, and their families, in order to provide a light during some of the most trying times in their lives. Aleph also advocates on behalf of individual criminal defendants in limited circumstances, and regularly commissions amicus briefs promoting favorable policy changes. In the nearly 40 years since its inception, Aleph has gained substantial experience and insight in the area of alternative sentencing.

Sentencing proposals prepared by Aleph are designed to mete out appropriate, substantive punishment with the greatest benefit and lowest cost to society, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education. Every proposal Aleph submits to the federal courts carefully considers the factors outlined in 18 U.S.C. §3553(a) including, but not limited to, "the history and characteristics of the defendant," id. §3553(a)(1), and the legislative directive to provide, "correctional treatment in the most effective manner." Id. at §3553(a)(1)(D). Moreover, we have, in hundreds of varied cases and situations, worked to assist courts in fashioning a particularized sentence, "sufficient, but not greater than necessary," to comply with the purposes set forth in the relevant sentencing statute. 18 U.S.C. §3553(a).

Aleph maintains certain parameters that must be satisfied before it will advocate for a defendant with regard to sentencing: the offense of conviction must not involve actual use of predatory violence; the defendant must accept responsibility for his or her conduct and express genuine remorse; and we must be confident that the defendant does not pose a future threat to society.

Judge Weinstein described Aleph as follows:

> [T]he Aleph Institute…understands and forces us to face the fact that each person deserves to be treated with respect as an individual personality and not as…a faceless number…The Aleph Institute is doing extraordinary fine work. Its assistance to defendants and their families provide standards of compassion and aid worthy of emulation…

> Aleph helps in three ways: First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those outside, particularly the children of prisoners, to retain their ties with prisoners. As

a result of its good work, Aleph is widely known and respected by penal and judicial authorities.[1]

The Honorable Joy Flowers Conti, Chief District Judge of the United States District Court for the Western District of Pennsylvania, has noted, "You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do." (Address to the Pittsburgh Chaplains Conference, November 19, 2014.)

Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by alternative means. Motivated by that belief, we have endeavored to become a resource to those seeking reform of the criminal justice system, and in particular, alternative sentencing.

## PHILOSOPHY

Since inception, Aleph has developed institutional expertise with various sentencing modalities. In analyzing the nature and form of sentencing, Aleph has developed the view that custodial sentences should be reserved for predatory individuals as well as individuals that pose a significant or ongoing danger to society. We agree with William Fitzpatrick, the former President of the National District Attorneys' Association, who suggests that society "use prison for those we are afraid of, not those whom we are mad at based upon their behavior."[2]

Aleph's perspective on sentencing is based on these convictions and supported by a consensus of social scholars and legal academics that study penal policy. For more on the relative merits of alternatives to incarceration, please see Appendix C.

## ROLE

Our extensive experience has taught us that many of the goals of the criminal justice system can often be accomplished through alternative means. Motivated by that belief, Aleph endeavors to become a resource to those seeking reform of the criminal justice system, and in particular, alternative sentencing. We often advocate for sentences that include an alternative, non-custodial component. The non-custodial nature of the sentence allows individuals to directly address the shortcomings within themselves that led to their offense and give them an opportunity to use their conviction as a conduit to improve the world around them.

In our role as advocating for a better approach to sentencing, we believe it is imperative to regularly bring thought leaders together with judges and prosecutors to discuss the sentencing framework. Over the past few years, we have held two conferences that focused on alternatives to incarceration.

---

[1] Jack B. Weinstein, *Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines*, 1 Judge J. 16, 28 (1989).
[2] April 26, 2016 letter to Senators Mitch McConnell, Senate Majority Leader, and Harry Reid, Senate Minority Leader.

In March 2016, we organized and hosted a symposium at Georgetown Law School, the Alternative Sentencing Key Stakeholders Summit ("ASKS Summit"). Building on the success of the ASKS summit, we hosted another summit, Rewriting the Sentence, in June 2019 at Columbia Law School. The Rewriting the Sentence summit convened more than 400 judges, prosecutors, defense counsel, probation and pretrial officers, individuals directly affected by incarceration, advocacy groups, and other key stakeholders in the criminal justice system to examine the tremendous culture change taking place in the alternatives to incarceration arena. The summit highlighted an array of alternative approaches to criminal justice currently isolated in pockets throughout the country and brought together leaders of innovation in the field to broadcast best practices and ideas for further implementation of alternatives. The Federal Judicial Center sponsored a cohort of federal judges from all over the country to attend the summit.

Some 80 speakers were featured over the two-day convening, including: a panel of reform-minded newly elected DAs, highlights of innovative practices nationwide, and panels on restorative justice, the role of mercy in our system, the merits of risk assessment tools, pretrial justice, and other hot topics in justice reform. Speakers who imparted their views on criminal justice policy relating to incarceration included Hon. New York State Attorney General Letitia James; Congressmen Hakeem Jeffries of New York and Doug Collins of D.C., who championed the recently passed First Step Act; Hon. State's Attorney Marilyn Mosby of Baltimore, MD; Hon. Virginia Phillips, Chief U.S. District Judge for the Central District of California; Hon. Rodney Ellis, Commissioner of Harris County, TX; Hon. Esther Salas, U.S. District Judge for the District of New Jersey; Hon. Leo Sorokin, District Judge for the District of Massachusetts; Vincent Schiraldi, Co-Director of the Columbia Justice Lab; Hon. Larry Krasner, District Attorney of Philadelphia; Hon. Nancy Gertner, Professor of Law at Harvard Law School and former District Judge for the District of Massachusetts; Matthew Charles, a fellow at FAMM and the first beneficiary of the First Step Act; and Representative Roger Goodman, Chair of the House Public Safety Committee of the Washington State Legislature. A complete list of speakers is available at www.rewritingthesentence.org/agenda.

Also at the conference, Aleph formally announced the formation of the Center for Fair Sentencing, a clearinghouse that hosts a digital portal on alternatives to incarceration. The Center will bind together the community of stakeholders exploring or exemplifying the best practices in alternative programs; provide data and analysis; lift up examples of programs using data-informed approaches and best practices; publish turnkey guides, such as one for establishing alternative programs; proffer policy white papers and reports; and advocate for expansion of the use of non-custodial approaches throughout all stages of the criminal legal system. As a result of the 2016 and 2019 conferences, we have been able to collect critical data in helping us prepare the recommendation that we are providing in this situation.

In addition, Aleph regularly pursues executive clemency for individuals. Most recently, Aleph successfully lobbied the Trump administration to commute the sentences of two individuals. The first, Rabbi Sholom Rubashkin, was serving a 27-year sentence imposed as a result of a raid on his kosher meatpacking plant that uncovered irregularities. The second is Ronen Nahmani, who was serving a 20-year sentence for selling a synthetic marijuana analogue product at a time when the status of the substance was legally fluid. While Ronen was languishing in prison for what was

essentially a regulatory offense, his five young children were on the verge of becoming orphans as his wife was suffering from an aggressive form of breast cancer with a poor prognosis.

Aleph was also one of several organizations who participated in the drafting of The First Step Act, Pub. L. No. 115-391 (2019). Aleph's input was instrumental in adding non-violent financial offenders to the category of persons eligible for relief under the statute.

## BASIS OF PHILOSOPHY

At a fundamental level, we center our work on the belief that, as Rabbi Schneerson, *of blessed memory*, said: "Our souls cannot be broken that they should need repair, nor deficient that they should need anything added. Our souls need only to be uncovered and allowed to shine." We start from the premise that the individuals in the criminal justice system are, first and foremost, human beings in need of rehabilitation and reform. We inevitably arrive at the conclusion that the system needs to fundamentally change and more compassion should be shown. The current mindset that incarceration is the default for malfeasance is failing society and the individual; the objective should be restorative justice. The Bible's code of civil law mandates the establishment of courts of justice to judge and sentence lawbreakers. However, prison is conspicuously absent as a form of punishment. This is based on the Torah principle that everything in the world was created by G-d for a positive purpose and that every individual, no matter their shortcomings, has a mission to fulfill.[3]

## SELECTING CLIENTS

We infuse this philosophy through every case that we accept. Our advocacy is deeply rooted in our conviction that incarceration should not be used as a default punishment absent a compelling need. We are selective in the cases that we take on. Our criteria include the following:

· The potential client is not charged with an offense of a predatory nature, a sex offense, or arson.

· The potential client expresses clear and genuine remorse.

We are extremely careful in identifying cases that are especially amenable to alternative approaches, and we strive to ensure that our submissions carefully consider the factors outlined in 18 U.S.C. §3553(a), with a particular focus on the legislative directive to "provide the defendant with...correctional treatment in the most effective manner."[4] Aleph provides all services *pro bono* and we do not accept any payment or remuneration. Rather, Aleph tries to assist courts in fashioning particularized sentences that are "sufficient, but not greater than necessary" to comply with the purposes set forth in the relevant statute.[5]

---

[3] Talmud Shabbos 77b; Bereishis Rabba 44:1, 10:7.

[4] 18 U.S.C. §3553(a)(2)(A), (D).

[5] *Id.*



# Appendix B

# Comments on Aleph and Alternative Sentencing



Over the past decades, Aleph has received incredible support and commendation from current and former members of the federal judiciary, for which we are extraordinarily grateful. Below are several comments from the judiciary about Aleph and alternative sentencing:



"Rabbi Sholom Lipskar, the guiding force of the Aleph Institute, and his associates understand… that each person deserves to be treated with respect as an individual personality and not as…as faceless number. The Aleph Institute is doing extraordinary fine work. Aleph helps in three ways. First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those on the outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities"**—Hon. Jack B. Weinstein of the U.S. District Court Judge for the Eastern District of New York, Eastern District of New York**



"Aleph historically has upheld the goals of sentencing by urging prudence to protect society, and humanity to recognize that it is people we are sentencing." **—Former Attorney General and Chief Judge of the United States District Court for the Southern District of New York, Michael B. Mukasey**



"For over 35 years Aleph has been championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes. Both these individuals and the Nation are the beneficiaries of Aleph's goodness and mission."**—Former Director of the FBI, Louis Freeh**



"We need to prove going forward what I know in my bones is the truth, which is, these [alternative sentences] work, just as they worked in the states. And they put a human face on a criminal justice system that, for the last 25-30 years, is so desperately in need of a little humanity. This is the right thing to do."— **Hon. John Gleeson, former District Judge of the United States District Court for the Eastern District of New York (ret.), speaking at an alternative sentencing summit that Aleph hosted.**





"The opportunity to work as a conviction and sentence alternative (CASA) judge is the most rewarding thing I have ever done. I have been a judge since 1991, but the ability to sit down face to face, without our robes, and listen to the stories of the defendants, their day to day struggles… has been a very sobering but enriching experience. Their car breaks down, they can't get to work, then they are evicted, then their kids are taken—something as simple as a car breakdown can start this chain of events. People who are living so close to the edge, even when they are trying very, very hard, it doesn't take much to send their lives into a downward spiral."**—Hon. Virginia Phillips, Chief U.S. District Judge, California, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"While judging, in general, requires the application of law to the facts, sentencing requires more. It necessarily involves empathy and compassion, which Aleph surely brings to the table. **At a time when sentencing principles are changing, Aleph's input is invaluable.** It provides careful analysis of alternatives to incarceration entirely consistent with – and some may say better suited to – public safety. It provides a critical link between prisoners and their families and friends, making certain that prisoners – human beings – do not disappear behind the walls. Put simply, Aleph brings to bear its reservoirs of compassion and empathy, both before during and after punishment has been imposed, and has been doing so for 35 years; The men who [I sentenced years ago and] I am following now, their stories are simply extraordinary. The time lost in their lives, the families that have disintegrated because they were put in a prison in the middle of the country, the relationships that they may have had, that were not fabulous to begin with, but at least were something. We have to talk about what do we do to repair these communities."**—Hon. Nancy Gertner, Judge, United States District Court of Massachusetts, Ret., and Professor at Harvard Law School**



"I think we are all in agreement this has been an extraordinary summit….35 years ago, a young Rabbi started some educational institutions, believing… that education was a fundamental right and goal of all people. He also had an interest—because of faith, belief and experience—that reforms could be made in the criminal justice system; to deal with defendants more humanely, to be aware of the impact on families, [and] the problem of reentry, and he started an institution to deal with these problems. Today we are the beneficiaries of that vision and that work."**—Judge Charles B. Renfrew, United States Deputy Attorney General and Judge, United States District Court, Northern District of California**





"The Aleph Institute must be commended for its vision in bringing together at the ASKS Summit such diverse and interesting people and perspectives on the questions of criminal justice reform and sentencing alternatives in this era of mass incarceration."**—Chief Magistrate Judge Brooke Wells, United States District Court, District of Utah**



"You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do."**—Hon. Joy Flowers Conti, Chief District Judge of the United States District Court for the Western District of Pennsylvania**



"Today judges and lawyers, prosecutors and law enforcement communities…are engaged in trying to make certain that our system is fair. It takes a collaborative partnership and that's why I am so glad that all of us are here committed to making certain our justice system is the best that it can be. And I thank [Aleph] for being here. And I thank you for your continued great work."**—Hon. Bernice Donald, United States Circuit Judge for the Sixth Circuit**



"The many problems in our system cannot be addressed by simply building more prison beds. One of the keys of an effective Department of Corrections will be…great emphasis on alternatives to incarceration. Organizations such as the Aleph Institute will be key to any community-based programs." **—Lawton Chiles Former Governor, FL**



"Very impressive. I have reviewed countless alternatives during my years on the bench. This is one that is realistic."**—Hon. Thomas E. Scott, Former United States District Court Judge for the Southern District of Florida, in reference to an Aleph alternative sentencing proposal**





 "[Criminal Justice reform] is hard work and even if we do it thoughtfully, and with the openness and humanity it requires, there will inevitably be setbacks and disappointments…But it is work that draws its sustenance from the divine spark in each of us. I commend Aleph for its decades of commitment, and for convening such an impressive group of people and organizations**."—Hon. Jeremy Fogel, Former Director of the Federal Judicial Center, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



 "When we approach alternatives to incarceration, we need to think about...the individuals, the population we're dealing with and [to] remember that sometimes just a little compassion, just a little time makes all the difference."—**Hon. Esther Salas, U.S. District Judge, New Jersey, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



 "When you send a person to prison, you send his or her family to prison with them."—**John Creuzot, District Attorney, Dallas County, Texas, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



 "Our bench [is] thinking about sentencing in a more meaningful way...we are seeing a positive element as a result of that…We are employing alternatives. We are reducing the amount of people receiving custodial terms, overall lowering the amount of time that we are imposing terms of sentence… lowering terms of supervised release and probation…You can see by our rearrest rates, these numbers have dropped in the past five years. And likewise, when we are talking about post-conviction outcomes and revocation, ours is well below the national average."—**Mark Gjelaj, Deputy Chief U.S. Probation Officer, Eastern District of New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



 "I think the place where we need to start thinking about a paradigm shift is where the concepts of atonement and forgiveness interact."—**Paul Fishman, Former U.S. Attorney, New Jersey, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**





"For me, success looks like changing the focus of our work as crime fighters, from strictly prosecution and punishment to prevention."**—Cyrus Vance, District Attorney, Manhattan, New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"The justice system, as you know, was meant to correct behavior and to keep our community safe, not simply penalize individuals. But unfortunately, and misguidedly, the evolution of the system made it one that's heavy on punishment, devoid of basic human dignity, light on rehabilitation, hostile to reform, and even lighter on transparency. We have witnessed that system go horribly wrong."**—Hon. Letitia James, Attorney General, New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"We have a duty to be aware. As a prosecutor, we are the ones who decide what sentence recommendations will be made to the court. It is incredibly important to understand and be aware of the reality of the sentences we help impose. We have to remind society of rehabilitative solutions."**—Hon. Marilyn Mosby, State's Attorney, Baltimore, Maryland, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"Rehabilitation and recovery are no longer dirty words."**—Chuck Grassley, Senior U.S. Senator, Iowa, at Aleph's 2016 ASKS Summit, Georgetown University Law Center**



# Appendix C

# Incarceration vs. Alternative Sentencing



# **Overview**

We recognize the sobering and complex task judges undertake in crafting criminal sentences, well expressed by Judge Denny Chin (writing for the United States Court of Appeals for the Second Circuit): "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal citations and quotation marks omitted).

When sentences are crafted to mete out **appropriate, substantive punishment with the greatest benefit and lowest cost to society**, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education, results have shown to be substantial and meaningful, leading to hundreds of successful rehabilitative outcomes.

The United States's prevailing method of sentencing, which uses incarceration as a default, has staggeringly high economic and social costs, **as well as a colossal social cost on the defendant's family**. The total cost of incarceration is approximately $1 trillion annually, which approaches six percent of GDP and is 11 times larger than corrections spending alone. The social cost is more difficult to measure, but the literature describes myriad problems related to incarceration, especially the effect of parental incarceration. Specifically, research shows that children of incarcerated parents demonstrate maladaptive symptoms, including behavioral problems, difficulties at school, depression, and an increased risk of winding up in prison themselves.

Two-thirds of federal judges responded to a survey in 1996 saying there ought to be alternative to incarceration programs. DOJ supports them. FJC supports them. The ABA, Right on Crime, and organization across the political spectrum support them.

Our nearly four decades of experience assisting the courts in this arena have taught us that, in certain cases, many of **the goals of the criminal justice system can be accomplished by alternative means and at little or no cost to the Government, especially when Aleph is involved**. The reason why thoughtfully crafted alternative sentencing plans work is best articulated by the Hon. John Gleeson, former District Judge of the United States District Court for the Eastern District of New York (ret.), speaking at an alternative sentencing summit that Aleph hosted at Georgetown Law School:

> "We need to prove going forward what I know in my bones is the truth, which is, these [alternative sentences] work, just as they worked in the states. And they put a human face on a criminal justice system that, for the last 25-30 years, is so desperately in need of a little humanity. This is the right thing to do."



This perspective on sentencing is supported by a consensus of the social scholars and legal academics that study penal policy. A survey of the literature on the subject reveals that lengthy prison sentences do not further any legitimate penological goals other than mere punishment— and even that is contested. In fact, the National Institute of Justice has concluded that **"long prison sentences do little to deter people from committing future crimes"** (William Fitzpatrick, a former President of the National District Attorneys' Association, April 26, 2016 letter to Senators Mitch McConnell and Harry Reid). *See also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("There is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs.")

Furthermore, the NIJ explains that:

> …compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects.[1]

There is also a significant financial cost associated with incarceration. The individual is removed from society and not able to earn a living or pay taxes. Society's net loss is compounded because, according to the United States government, the fee to cover the average cost of incarceration for Federal inmates was $34,704.12 ($94.82 per day) in FY 2016 and $36,299.25 ($99.45 per day) in FY 2017.[2] The financial cost of incarceration is another reason that we seek to create alternative sentences that allow defendants to be able to contribute to society instead of being clothed, housed, and fed by the government.

In addition to these individual and community considerations, "the consequences of incarceration on family members are numerous and they place already fragile families at increased risk."[3] "Research suggests that the children of incarcerated parents are among the most at-risk, yet least visible, populations of children. Parental incarceration serves as a significant risk factor for a host of negative consequences, particularly with respect to emotional and behavioral factors, physical care and custody, and contact with the parents."[4] Thus, whenever a court sentences an individual, it is not a stretch to say that it sentences an entire family, and the children of incarcerated individuals will suffer a permanent scar.

---

[1] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, last Modified June 6, 2016 &lt;https://nij.ojp.gov/topics/articles/five-things-about-deterrence&gt;.

[2] U.S. Department of Justice, Bureau of Prisons, Annual Determination of Average Cost of Incarceration, THE FEDERAL REGISTER, Vol. 83, No. 83, 18863 (4/30/18).

[3] Kolina J. Delgado, *The Impact of Incarceration on Families: A Summary of the Literature*, WRIGHT STATE UNIVERSITY CORE SCHOLAR: PSYCHOLOGY at 14 (2011) <https://corescholar.libraries.wright.edu/psych_student/5>.

[4] *Id*. at 9 (internal citations omitted).



Aleph's family services department has personally witnessed the painful reality of the children of inmates who have attempted suicide or turned to drugs. Tragically, in the case of one family with whom Aleph was involved, one of the daughters whose father received a lengthy prison sentence for a financial crime committed suicide last year.

Obviously, alternative sentences must carefully consider the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with… correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A), (D). Moreover, sentences should be "sufficient, but not greater than necessary" to comply with the purposes set forth in the relevant sentencing statute. *Id.*

## On Crafting an Alternative Sentence

An alternative sentence can be crafted to directly address the crime that brought an individual into the criminal justice system. An individual who, for example, must serve the community that he or she has wronged, or must use his or her strengths to support those who need help, **may have a truly redemptive experience that leads to rehabilitation if given the opportunity**. That is why in appropriate cases, sentences that favor an alternative, non-custodial component that keeps them with their families and in their community, with a mandate to directly address the root causes and inevitable consequences of their offense, allows individuals to consider their personal shortcomings that led to their offense, and **gives them an opportunity to improve themselves and the world around them, while also savings their family's fate**.

Therefore, we strive to construct corrective roadmaps that are designed to (i) confer a benefit on society as a whole, (ii) show the American people the proportional punishment associated with violating American society's standards and (iii) ensure that the individual is held accountable so as to prevent recidivism. We do not want to punish someone so extensively and create undue burdens or hardships on innocent people like young children. In our experience, lengthy periods of incarceration in cases where the individual does not present a danger to society unnecessarily inhibit defendants from fulfilling their potential, and devastate the family and community. The unintended consequences of such devastation breed bitterness, anger, insensitivity, and a greater chance of recidivism and multi-generational dysfunction. Too many defendants "lose their claim to a future" when "lengthy prison terms" are imposed in place of "reasonable, innovative, and promising alternatives to incarceration."[5]  Individuals can only be of full service when they have the freedom to act with their own accord. Prisoners are denied the opportunity to serve in this manner and improve by means of their own free will.

Aleph believes that prison should be used sparingly, primarily when it is necessary to protect the public from violent or predatory individuals. Rather than being strictly punitive, criminal punishments should be designed to confer a benefit on the victims of the offense, society as a whole, and the perpetrator.[6]  As such, our ethical convictions and experience lead us to believe

---

[5] United States v. Dossie, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation omitted).
[6] Talmud Berachos 606b; Likutei Torah Nasso.



that the best way to address lawbreakers who do not pose an active threat to society is to address both the root causes and the necessary consequences of their offenses. It is vital to keep people with their families in their community and productively contributing to society in order to effectively address their actions while ensuring that others do not needlessly suffer.

In formulating the Alternative Sentence proposal in this case, Aleph's team of legal specialists have carefully reviewed the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with… correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A), (D).



**Appendix D**

# Selected Successful Aleph Alternative Sentencing Cases



We at Aleph are deeply grateful to have had the honor of submitting numerous alternative sentencing proposals to federal and state judges and prosecutors around the county, helping the judiciary secure hundreds of successful rehabilitative outcomes. Below are a handful of examples:

# 1.

In December 2018, Judge Joseph F. Bianco accepted in part a proposal submitted by Aleph, significantly reducing a defendant's custodial sentence in exchange for time served in a rehabilitation facility to treat a gambling problem. Aleph's mental health and legal experts determined, and the Court agreed, that the defendant's gambling addiction had been a major motivator in his criminal behavior. *See United States v. Barkany*, Case No. 13-CR-362 (E.D.N.Y.). Under the guidelines, the defendant was facing as much as 295-365 months. Aleph worked intensively with the defendant, helping him get the psychological evaluation he needed to enroll in the program and providing critical support to him and his family.

# 2.

In another successful case, a physician was convicted in the Western District of Pennsylvania for offenses related to the improper prescribing and dispensing of controlled substances. His guideline range, as accepted by the court, called for four years of imprisonment. After multiple interactions, Aleph's mental health and legal experts determined that the defendant was truly remorseful and that he had suffered sufficient punishment in the form of the tremendous collateral consequences stemming from his conviction, including personal shame, public humiliation, and the loss of his license to practice medicine. Aleph suggested that an alternative, non-custodial sentence was appropriate. The court accepted Aleph's recommendation and sentenced the defendant to a two-year term of probation, during which he was required to perform hundreds of hours of community service, some of which was facilitated by Aleph. The defendant successfully completed his sentence and has not reoffended or caused any further harm to society. *See United States v. Barnett*, Case No. 2:16-cr-153-JFC (W.D.P.A. 2017).

# 3.

In another recent case, we helped a young man in his early twenties who was facing one to five years in prison for trafficking marijuana. Aleph's mental health and legal experts determined that he was naive and impressionable and didn't fully understand the consequences of his actions. Aleph also learned that he had become more observant in the years leading up to his offense, but that he had turned away from his faith after a year in which he faced a difficult breakup, a serious car accident, and a financial setback. Aleph proposed that he be placed into an unconventional diversion program, in which he would take on extensive religious study, which would be



supervised by Rabbis at Aleph. The judge agreed to this proposal and treated the case like a standard diversion program, imposing neither jail time nor probation. She agreed to personally supervise the young man's progress for three years but planned to rely on Aleph for day-to-day monitoring and quarterly reports, which we continue to provide. *See State v. David Ian Alper*, Case No. CR19-0423 (Second Judicial District, State of Nevada 2019).

# 4.

A teenager who was suffering with severe depression and drug addiction for most of his adult life was facing felony charges following an arrest. Aleph was able to secure for him a place in a pilot diversion program that provided an alternative to incarceration. This program gave him housing and the intensive mental care that he needed to ultimately be a productive member of society. To date his progress reports have been outstanding. The built in support has enabled him to stay clean, to thrive mentally and emotionally, and to exceed the courts expectations for his success. *See People v. Gutnick*, Case No. LAXSA100756-01 (Superior Court of California, County of Los Angeles 2019).

# 5.

A young woman was involved in a company that sold binary options with misleading sales tactics. She was facing several years in prison but had unique health challenges which made the possibility of a lengthy incarceration substantively more onerous. The woman showed extreme remorse for her actions, and had already taken action to make amends by beginning to volunteer in a nursing home for upwards of twenty hours per week. Aleph presented the woman's unique circumstances to the judge and proposed that she pay for her crime with house arrest and continues community service. The judge sentenced her to only four months of incarceration, to be followed by four months of house arrest and the proposed community service. *See United States v. Shira Uzan*, Case No. 8:18-CR-608 (District of Maryland. 2019).